**J.G. and R.G., on behalf of N.G., Plaintiffs,**

v.

**KIRYAS JOEL UNION FREE SCHOOL DISTRICT, Defendant.**

**No. 08 CIV 6395–WGY.**

United States District Court, S.D. New York.

March 31, 2011.

608

610

Gary S. Mayerson, Mayerson and Associates, New York, NY, for Plaintiffs.

Frederick J. Berman, Matthew J. Delforte, Shebitz Berman Cohen & Delforte, P.C., New York, NY, for Defendant.

**Memorandum and Order**

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

N.G. is an elementary school student with multiple disabilities. At the start of the 2005–06 school year, his parents, J.G. (his father) and R.G. (his mother), rejected the individualized education plan ("IEP") provided to N.G. by the Kiryas Joel Union Free School District ("Kiryas Joel") because no "mainstream" classroom component was offered. J.G. and R.G. then unilaterally placed N.G. at B'nai Yoel, a private Jewish yeshiva. N.G.'s parents now seek reimbursement from Kiryas Joel for their related educational expenses pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq.* (McKinney 2007), and the applicable state and federal regulations. They contend that procedural and substantive flaws in Kiryas Joel's IEP denied N.G. his statutory right to a free appropriate public education in the least restrictive environment.

## II. FINDINGS OF FACT[2]

### A. Kiryas Joel Union Free School District

While the basic premise of this case is identical to that of virtually every action brought under the IDEA, the backdrop against which it takes place is most unusual. Kiryas Joel Village, located within the town of Monroe in Orange County, New York, is an ultra-Orthodox Jewish enclave of the Satmar Hasidic sect. *See Board of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet,* 512 U.S. 687, 690, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994).

The residents of Kiryas Joel are vigorously religious people who make few

---

1. Of the District of Massachusetts, sitting by designation.

2. The parties have not provided this Court with the entire record of the proceedings below, which includes over 8,000 pages of transcript and 200 exhibits. Because this is a "case stated," *see infra* note 25, the Court treats as undisputed any findings of fact made by the impartial hearing officer ("the IHO")

and the state review officer ("the SRO") where they relied on parts of the record not provided to the Court.

The transcript pages provided to this Court can be found at Pls.' Exs. D–Part 1 to D–Part 4, ECF Nos. 9–4 to 9–7, and Def.'s Exs. A–1 to A–9, ECF Nos. 15–1 to 15–9. Citations to the transcript herein are given simply as "Tr. [page number]."

concessions to the modern world and go to great lengths to avoid assimilation into it. They interpret the Torah strictly; segregate the sexes outside the home; speak Yiddish as their primary language; eschew television, radio, and English-language publications; and dress in distinctive ways that include headcoverings and special garments for boys and modest dresses for girls. Children are educated in private religious schools, ... where they receive a thorough grounding in the Torah and limited exposure to secular subjects....

These schools do not, however, offer any distinctive services to handicapped children....

*Id.* at 691–92, 114 S.Ct. 2481. Because special education services were not available to them at the religious schools, children with disabilities were "forced to attend public schools outside the village, which their families found highly unsatisfactory." *Id.* at 692, 114 S.Ct. 2481. By 1989, only one child from Kiryas Joel Village was enrolled in the local public school district, the Monroe–Woodbury Central School District, while the village's other children with disabilities received either privately funded special education services or none at all. *Id.* at 693, 114 S.Ct. 2481.

To solve this unique problem, the New York State Legislature authorized Kiryas Joel Village to create its own union free school district. *Id.* (citing 1989 N.Y. Laws, c. 748). The new school district, despite its plenary authority over the elementary and secondary education of all school-aged children in the village, began operating only a special education program exclusively for children with disabilities. *Id.* at 693–94, 114 S.Ct. 2481. Parents continued to educate their typically developing children in the private religious schools, known as "yeshivas." *Id.* at 694, 114 S.Ct. 2481. Five years after the district's creation, the United States Supreme Court held that the New York statute creating it violated the Establishment Clause of the First Amendment. *Id.* at 690, 114 S.Ct. 2481. Four legislative attempts later, constitutional concerns over the district's existence have been put to rest. *See* Tamar Lewin, *Controversy Over, Enclave Joins School Board Group*, N.Y. Times, Apr. 20, 2002, at B4.

Today, Kiryas Joel continues to operate as the village's only public school and continues to operate only a special education program.[3] Impartial Hearing Officer's Decision ("IHO Decision") 50, Def.'s Ex. E, ECF No. 15–16. The district serves approximately two-hundred children with disabilities; roughly half of them are educated in the district's self-contained, special education classrooms, while the other half attend the private yeshivas and receive only related services from Kiryas Joel. *Id.* at 31, 50. Kiryas Joel also has established "resources room services" on-site at one of the local yeshivas, *Id.* at 32.

Because parents in Kiryas Joel "are highly interested in their children getting a Yeshiva religious education,"[4] Tr. at

---

3. The yeshivas, for their part, still do not offer special education programs. Tr. 5076.

4. In recent years, no Kiryas Joel parent has sought a regular public school education for his or her child. Tr. 5152, 7262, 7264. If a non-religious child without disabilities ever were to move into the district and seek a regular public school education, Kiryas would pay tuition to send the child to Monroe–Woodbury or a neighboring school district.

*Grumet*, 512 U.S. at 694, 114 S.Ct. 2481. Likewise, if a non-religious child with disabilities were to move into the district and be deemed eligible for a mainstream placement in a regular education classroom for at least part of the school day, Kiryas Joel would pay tuition to send the child to Monroe–Woodbury or a neighboring school district. Tr. 7262, Thus, while Kiryas Joel has no in-district regular education, it could arrange for a child to attend an outside public school, as it did once

7264, they want even their children with disabilities to be in "culturally and linguistically appropriate program[s]," *id.* at 5153. While Kiryas Joel focuses on teaching children to read, write, make decisions, and understand information, parents in the village, "most typically, want their children to be able to recite prayers, to read the Bible in its original, in the Hebrew text, to read comment areas in that language." *Id.* at 7265. Some parents have objected to Kiryas Joel teaching reading and writing because they instead want their children to pray and study the Bible and "they feel that their only way of doing that is if they go to the parochial school." *Id.* "if [parents] had the choice, if their child does not have special needs they wouldn't send their child to [Kiryas Joel] either, they prefer having their children in yeshivas." *Id.* at 5075; *see id.* at 5074 ("[P]arents send their children to the private yeshivas here, and that's one hundred percent true.").

Thus, it is not uncommon for the parents of a child with disabilities to ask Kiryas Joel about a mainstream placement at one of the yeshivas, and such requests are "frequently" granted. *Id.* at 7252. Mainstreaming, in this context, does not entail a regular education as usually conceived of, but does give children with disabilities the experience of "be[ing] with nondisabled peers for a short period of time" during the school day. *Id.* at 5155. Where a child with disabilities has shown progress in a special education setting, Kiryas Joel's Committee on Special Education ("CSE") considers whether "[the] child is ready for some other kinds of experiences," meaning a mainstream placement. *Id.* at 7253. At the same time, the CSE will not change a child's placement without first exploring the details of the transition to a more mainstream setting, usually by way of a trial period, to ensure that the child is not

put into "a failing situation." *Id.* at 7253–54. Kiryas Joel employs "community liaisons" to help "smooth the waters" with the yeshiva of the parents' choice and assess the appropriateness of that placement. *Id.* at 7255–56. Only after the liaisons have investigated the possibilities will Kiryas Joel consider changing a child's IEP because changing an IEP means "saying [the district] believe[s] that this will work." *Id.* at 5758.

Some of the children for whom mainstreaming is appropriate attend Kiryas Joel during the day and the yeshiva before school or after 3:00 P.M. *Id.* at 5240. As this only amounts to half an hour to an hour at the yeshiva, parents occasionally want their children to spend more time there. *Id.* at 5241. If Kiryas Joel believes that the particular child can still excel in terms of meeting his or her public education requirements, then the district will consent to a "less restrictive education," which could entail only half days at Kiryas Joel or resources room services at the yeshiva itself. *Id.* If Kiryas Joel believes that "the child really must be in the special education class for a longer period of time" to "receive all of the services and the education that the child is mandated to receive," then "that becomes a larger discussion with the staff that deals with the child" as well as the CSE. *Id.* at 5241–42. Ultimately, the district's concern is whether the placement will allow the child "to achieve all the goals that [the CSE] put[s] forth in the IEP." *Id.* at 5242.

"Belive[ing]" that the parent's voice has to be heard" in determining what is best for a child, Kiryas Joel's CSE is genuinely willing to accommodate requests by parents for mainstreaming. *Id.* at 7269. Parents are given the opportunity to convince the CSE that their child is eligible for a less restrictive placement, just as Kiryas

in 1989. *Grumet,* 512 U.S. at 693, 114 S.Ct. 2481.

Joel personnel are given a chance to convince the parents of their position that special education is appropriate. *Id.* The district's preference is to reach a compromise with parents, whenever possible. *Id.* at 7270. For example, while prayer cannot be a goal or activity outlined in a student's IEP, the CSE may consider whether the child "can listen and repeat and tell a story over again," which is part of the New York state curriculum but also "might match up with what the non-public school is going to do." *Id.* In this way, the district can satisfy the parents' goal that the child be in the yeshiva for as much of the day as possible while still meeting state requirements. *Id.*

## B. N.G.'s Educational Background

N.G. is an elementary school child with multiple disabilities. CSE Draft Data Form ("CSE Draft") 2, Dist.'s Ex. B-2, ECF No. 15-11. Born September 6, 2000, N.G.'s developmental delays were apparent from a very young age and attributed to " 'growth retardation during pregnancy' resulting in global developmental delays." *Id.* at 1 (quoting N.G.'s physicians). At five months, he was "already receiving a great deal of therapy," Social History by J. Stimmel ("Social History") 1, Dist.'s Ex. B-2, ECF No. 15-11; CSE Draft 1. In May 2003, N.G.'s parents placed him in a "family care" program, operated by the New York State Office of Mental Retardation and Developmental Disabilities, and he began living with a foster family in Monsey, New York. Social History 1; 2005-06 School Year IEP by Kiryas Joel Free Union Sch. Dist. ("2005-06 School Year Kiryas Joel IEP") 4, Dist.'s Ex. C-1, ECF. No. 15-13; IHO Decision 10. The family care placement was intended to be temporary while R.G. was recuperating from the delivery of the family's third child, but N.G. remained in that placement until November 10, 2005. IHO Decision 10; Social History 1.

While residing in Monsey, N.G. attended a private, full-day preschool program at the Hebrew Academy for Special Children (HASC), as recommended by the East Ramapo Central School District's ("East Ramapo's") Committee on Preschool Special Education ("CPSE"). Bilingual Psychological Evaluation by S. Solnica ("Psychological Evaluation") 1, Dist.'s Ex. B-2, ECF No. 15-11; 2005 Extended Year IEP by East Ramapo Sch. Dist. ("2005 Extended Year East Ramapo IEP") 3, Dist.'s Ex. C-1, ECF No. 15-13; Social History Update by D. Kammerman ("Social History Update") 1, Dist.'s Ex. B-1, ECF No. 15-10, At HASC, N.G.'s classroom had a student-teacher-aide ratio of 8:1:2. 2005 Extended Year East Ramapo IEP 3; Social History Update 1. HASC also provided N.G. with speech and language, occupational, physical, and vision therapy "to address his global delays." Occupational Therapy Annual Review by R. Dembitzer ("Occupational Therapy Review") 1, Dist.'s Ex. B-1, ECF No. 15-10.

In an evaluation dated July 18, 2003, HASC's school psychologist described N.G., who was nearly two years old at the time, as a "friendly" and "adorable" boy with significant delays in the areas of mental development, speech and language, motor skills, intellectual functioning, and adaptive behavior. Psychological Evaluation 1-4. N.G. "exhibited a few vowel-consonant utterances, but did not use intelligible language to communicate his needs" and "was unable to repeat a word," developmentally putting his language in the range of a nine-month old child. *Id.* at 2. While he would gesture to communicate his needs, he struggled to imitate actions or identify certain objects. *Id.* at 2-3. He could not yet walk. *Id.* at 3. The psychologist recommended that he "continue receiving Special Education in a small structured environment to learn crucial educational concepts, learning readi-

ness skills and independent functioning skills," as well as "related services to develop essential language and motor skills." *Id.* at 4.

Consistent with this recommendation, N.G. continued at HASC during the 2004–05 school year.[5] 2005 Extended Year East Ramapo IEP 3; Social History Update 1. During that year, when N.G. was roughly four and a half years old (fifty-four months), HASC undertook an annual comprehensive review of his performance and progress, including one educational and four therapy-related evaluations.[6] Annual Review Educational Evaluation by S. Motechin ("Educational Review"), Dist.'s Ex. B–1, ECF No. 15–10; Bilingual Speech and Language Annual Review by C. Epstein ("Speech and Language Review"), Dist.'s Ex. B–1, ECF No. 15–10; Occupational Therapy Review; Physical Therapy Annual Review by M. Gottesfeld ("Physical Therapy Review"), Dist.'s Ex. B–1, ECF No. 15–10; Vision Services Summary Annual Report by J. Forzono ("Vision Therapy Review"), Dist.'s Exs. B–2 to B–3, ECF Nos. 15–11 to 15–12.

### 1. N.G.'s Behavioral and Social Skills

In terms of N.G.'s behavioral and social skills, the evaluators characterized him as "adorable," "happy," "friendly," and "sweet." Educational Review 1, 4; Speech and Language Review 1; Occupational Therapy Review 1; Physical Therapy Review 1. He "enjoy[ed] interactions with adults and peers in the classroom" and knew everyone's name. Educational Review 4. Described as "smil[ing] often," N.G. often expressed excitement over fun, familiar activities and was eager to participate in them. Physical Therapy Review 1; Educational Review 1. Rebekah Dembitzer, who completed his occupational thera-

py review, noted that he was "animated and excited" in group occupational therapy sessions, sometimes "clap[ping] his hands and try[ing] to sing along with the therapist." Occupational Therapy Review 1. He would "laugh and smile while imitating silly gestures and activities" by his peers, but he did not "initiate appropriate social interactions with classmates." Educational Review 4. On occasion, N.G. "ha[d] a hard time exhibiting the appropriate emotions" in response to situations and would "become[ ] overly excited laughing at inappropriate times," such as when another child was hurt or crying. *Id.* at 1.

If guided to do so, N.G. would "share materials and hold hands with classmates while walking to activities outside of the [class]room." *Id.* at 4. He "enjoy[ed] participating in the structured activities throughout the day" and, as a classroom helper, "require[d] minimal verbal cues to complete jobs which involve[d] handing out materials to his classmates." *Id.* at 1. Over the course of the school year, his ability to follow directions had improved, and he was "more cooperative and attentive to tasks." Occupational Therapy Review 1. He could engage in parallel play by imitating the actions of others, although "[h]is pretend play schemes [were] simple, requiring adult prompting, guidance and demonstrations to help expand his play repertoire." Educational Review 4.

While generally a happy child, N.G. was prone to frustration and crying fits in response to being asked to complete tasks that he did not wish to perform. Shani Motechin, the education evaluator, stated that N.G. could be "self-directed and stubborn" as well as "easily frustrated" with a predilection to "cry and throw himself on the floor when things do not go his way or

---

5. The record does not include an IEP for the 2004–05 school year.

6. These evaluations, in large part, formed the basis of Kiryas Joel's CSE's IEP for N.G. for the 2005–06 school year.

if there are unexpected changes in his routine." Educational Review 1. Dembitzer similarly commented that he would "frustrate easily and ... become agitated and upset when asked to participate in certain activities." Occupational Therapy Review 1. Chava Epstein, N.G.'s speech and language therapy evaluator, also noted this tendency. Speech and Language Review 1. In his physical therapy evaluation, Miriam Gottesfeld agreed but indicated that this behavior had "significantly improved as of recent." Physical Therapy Review 1. Usually, after crying for a short time, N.G. would refocus in response to "coaxing and encouragement" and then begin to "participate appropriately in the activity." Physical Therapy Review 1; Educational Review 1. Dembitzer stated that N.G. "require[d] firm and consistent encouragement to motivate him to continue his task." Occupational Therapy Review 1. His overall distractibility and need for constant redirection was another theme of the evaluations. Educational Review 4; Speech and Language Review 1; Occupational Therapy 3. In his educational review, he was "very distracted and at various times tried to leave the testing area," and edible rewards were used to entice him to stay. Educational Review 3.

Two of the four evaluations noted that N.G. "willingly" and "easily" left his classroom to attend therapy sessions and was "generally cooperative during treatments." Physical Therapy Review 1; Speech and Language Review 1. In contrast, the other two evaluations indicated that he "ha[d] difficulty transitioning from the classroom to therapy," Occupational Therapy Review 1; Educational Review 3, but Dembitzer did acknowledge that he had "made significant gains" in this regard over the school year, Occupational Therapy Review 1.

### 2. N.G.'s Cognitive Functioning

Cognitively, N.G. was within the second percentile for his age group. Educational Review 3. His counting skills placed him in the range of a thirty-four month old child, while his matching abilities corresponded to those of a thirty-five month old. *Id.* He could match geometric shapes, but not complex patterns; he could not complete a six-piece puzzle or form a square using two triangles. *Id.* at 2–3. In terms of his comprehension skills, N.G. "recognized actions in pictures, understood use of objects, part/whole relationships, quantity concepts (one/all), and big/little," but "had difficulty with pronouns his and hers, understanding negatives in sentences, identifying colors, and categorizing objects into groups." Speech and Language Review 2. During the educational evaluation, N.G. "became very distracted by the pictures" being used to test his comprehension. Educational Review 2. He was able to follow ten simple commands and a two-step command in the correct order. *Id.* Overall, his comprehension was determined to be at the level of a thirty-three month old child. *Id.* at 2–3.

### 3. N.G.'s Speech and Language Skills

N.G.'s speech and language skills fell within the first percentile for children his age. Speech and Language Review 2. Epstein characterized his "significantly delayed total language skills" as "secondary to possible growth retardation in utero." *Id.* at 1–2. with regard to his expressive communication, he was able to use the Yiddish word for "no." or "nein"—and, in fact, "constantly" used it, "even when he desire[d] to participate in an activity." *Id.* at 2; Educational Review 2. N.G. could pronounce the consonants "n," "t," and "d," but his articulation could not be tested due to his otherwise "limited language abilities." Speech and Language Review 3. To communicate his wants and needs, N.G. used verbal sounds, gestures, and the Picture Exchange Communication System ("PECS"), which he adopted "quickly" and

began to use "independently and with minimal prompts during mealtime and toilet time appropriately."[7] *Id.*; Educational Review 2; Occupational Therapy Review 1; Visual Therapy Review 1. His therapy emphasized improving his recognition of objects within the classroom to make his needs known. Speech and Language Review 3.

### 4. N.G.'s Fine and Grose Motor Skills

Dembitzer remarked on N.G.'s delays of thirty-eight and thirty-five months in the areas of fine motor skills and visual motor integration, respectively, ranking him in the first percentile for both. Occupational Therapy Review 2. His ability to manipulate objects, like putting blocks in a cup after being shown how to do it, placed him in the range of a child under thirty months of age, according to Motechin. Educational Review 2. He could turn two to three pages of a book and fold and crease paper, but he was not capable of building a tower of two blocks or twisting and removing a bottle cap. *Id.*; Occupational Therapy Review 2. Although he attempted to play with and squeeze dough, his muscle strength was insufficient for him to do so. Educational Review 2. His hand grip was generally "weak." Occupational Therapy 1. He could pick up, but not pinch, small objects. *Id.* at 2.

As for his writing, N.G. scored below the thirty-month level: he could hold a pencil with his fingers ("a more age appropriate tripod grasp seem[ed] to be emerging"), make marks and scribbles, and inaccurately imitate a vertical line, but he could not replicate a straight line or circular strokes. *Id.*; Educational Review 4. In testing, he "demonstrate[d] a slight right hand preference during fine motor tasks although this [was] not yet consistent." Occupational

Therapy Review 2. "While attempting to do fine motor tasks, [N.G.] exhibit[ed] a slight tremor in his hands and ha[d] difficulty with small manipulatives." *Id.* His eye-hand coordination was "poor," and he tended to "overshoot[ ] during visual motor and fine motor tasks, making it more difficult for him to perform the above mentioned tasks." *Id.* He also experienced sensory processing delays. *Id.* at 3.

In his physical therapy review, Gottesfeld described N.G. as having "moderately low muscle tone throughout," poor balance, and slow protective reactions. Physical Therapy Review 1–2. While he was able to walk independently on level surfaces, his gait was abnormal and unsteady, and he lacked coordination, falling easily if challenged and bumping into objects and people. *Id.* at 2; Visual Therapy Review 1, Impulsive about walking, N.G. required reminders to go slowly and to take in his surroundings before moving. Visual Therapy Review 1. He could climb stairs either by walking sideways with both hands on the railing for support or by facing forward with someone holding his hand and giving him verbal cues; he could descend stairs with one or both hands by leading with his right foot, but he required contact guarding. Physical Therapy Review 2. He could not jump or kick a ball, and while he could throw a ball two to three feet, he sometimes fell forward when doing so. *Id.* He was beginning to learn to use the tricycle, though he favored his left leg and struggled to keep his right one on the pedal. *Id.* Gottesfeld rated N.G. as having delays of forty-four months in his stationary skills, thirty-eight months in his locomotion skills, and thirty-nine months in his object-manipulation skills. *Id.* His gross

---

**7.** There was contradictory testimony by R.G. that N.G. actually did not like using PECS or carry it over at home. IHO Decision 120; State Review Officer's Decision ("SRO Decision") 18, Dist.'s Ex. F, ECF No. 15–17, She believed it was too much work for him. IHO Decision 120.

motor skills were considered significantly delayed. *Id.*

While N.G. had "shown improvement" in eating crunchy foods and using an "up-and-down munch chew pattern," his feeding skills remained "impaired." Speech and Language Review 1, 3. He could drink from an open cup and feed himself, but not without spillage. *Id.* at 1; Education Review 4; Occupational Therapy Review 2. While he could remove his coat and pants, he "requir[ed] much help with fasteners" and general assistance with dressing himself. Educational Review 4; Occupational Therapy Review 2. He had recently begun a toilet training program, using PECS to identify his need to use the bathroom (although he "require[d] frequent reminders"), but he would not indicate if his clothing was wet or soiled. Educational Review 4; Occupational Therapy 3.

### 5. N.G.'s Vision

With respect to his vision, his evaluator in that area, Jennifer Forzono, noted that N.G. had "a delay in visual maturation and rotary nystagmus." Vision Therapy Review 1. N.G. reportedly "compensate[d] well by mainly using mainly his lower fields of vision (rather than central), when tasks [were] presented at midline or table top," and "[w]hen items [were] off to either side, he [was] observed to use his lower and peripheral fields, with slight compensating head movements (making his nystagmus more noticeable)." *Id.* at 2. He tended to "look past," instead of directly at, objects for which he was visually searching. *Id.* He was better able to see objects at distances of six feet or greater than at three feet or less, *Id.* Up close, his vision "fragmented—seeing in parts, rather than whole." *Id.* He used his head to track objects within six to twelve inches of his face, and when presented with an object closer than six inches, he would "over/under reach for it." *Id.* Forzono remarked that N.G. "utilize[d] a social

gaze to watch and imitate actions of other children, recognize familiar faces, and identify himself in a mirror." *Id.* Visually, he could discriminate between simple pictures and "locate a specific item among a group of different, but related objects." *Id.* Without verbal cues, however, he could not "look systematically in right-to-left/left-to-right order" when given four pictures in a row. *Id.* He also "display[ed] difficulties during exercises that focus[ed] on visual memory (e.g., being able to identify a mate to a missing shape or picture); visual association (matching pairs of objects that go together such as a comb and brush); visual sequencing (matching order of objects or alternating sequences of objects to color, shape, or size); higher levels of visual discrimination (sort by size, identify two identical pictures from a choice of three or more); and spatial relations/eye-hand related tasks (drawing lines between two parallel lines)." *Id.* at 2–3. Significantly, Forzono stated the importance of "foster[ing]" N.G.'s ability to "use his vision in right/left and top/bottom progression and discriminate letters in a line" because these "are prerequisites for reading—necessary for transitioning into Kindergarten." *Id.* at 3. She concluded that "[a]lthough [N.G.] has made tremendous gains in many areas of his visual functioning, his visual efficiency skills [were] splintered in the 2–to–3 year age range." *Id.*

In sum, Motechin stated that generally N.G. had "made much progress over the last year in all areas of functioning." Educational Review 1. Nonetheless, she "recommended that [N.G.] be enrolled in a highly structured program," explaining that,

> [c]onsistency and intensity are required to allow [N.G.] to maintain the gains he has made and to acquire new skills. A small adult-child ratio is necessary to give [N.G.] the adult guidance and support he requires to be successful.

[N.G.]'s needs should be met in a program which will continue to focus on the acquisition of communicative, social and cognitive skills to allow him to maximize his learning potential. *Id.* at 4. The therapists who evaluated N.G. all agreed that special education-related therapy services remained appropriate for N.G. Speech and Language Review 3 ("Speech and language therapy continues to be strongly recommended."); Occupational Therapy Review 3 ("it is recommended that [N.G.] continue to receive occupational therapy services."); Physical Therapy Review 2 ("It is strongly recommended that [N.G.] continue to receive physical therapy services."); Vision Therapy Review 3 ("[I]t is recommended that he continue to receive vision services."). Forzono echoed Motechin's sentiment that, with respect to his therapy, "[c]onsistency, carry-over, and follow-through are very important components, as they provide [N.G.] with continued reinforcement, thus enabling him to remain productive and successful." Vision Therapy Review 3.

## C. East Ramapo CPSE's 2005 Extended Year IEF for N.G.

In April 2005, East Ramapo's CPSE utilized these educational and therapy evaluations to develop an IEP for N.G. for the upcoming summer session, referred to as "an extended school year." 2005 Extended Year East Ramapo IEP 1. The IEP repeated the evaluators' findings that N.G.'s global delays were preventing him from engaging in activities appropriate for his age, that his language deficits were negatively impacting his learning and social functioning, and that his fine and gross motor skills were significantly delayed. *Id.* at 2–3. "Due to the complexity and severity of [N.G.]'s disabilit[ies]," *id.* at 4, the CPSE, after some consideration, rejected an "integrated" program incorporating regular education because N.G.'s "current academic skills, social/emotional needs, physical needs and management needs indicate that a setting with more support is needed to address the student's needs," *id.* at 2. "[T]o prevent substantial regression," the CPSE recommended that N.G. remain at HASC in a special education classroom with a student-teacher-aide ratio of 8:1:2 for five hours per day. *Id.* at 1. The CPSE also recommended that he participate in one thirty-minute session of individualized occupational therapy each week; one thirty-minute session of group occupational therapy each week; two thirty-minute sessions of individualized physical therapy each week; one thirty-minute session of group physical therapy each week; two thirty-minute sessions of individualized speech and language therapy each week; one thirty-minute session of group speech and language therapy each week; and one thirty-minute session of individualized vision therapy each week. *Id.* at 1–2.

N.G.'s mother, R.G., was present when East Ramapo's CPSE convened to develop the 2005 Extended Year IEP. *Id.* at 3. There is no mention in the IEP that R.G. requested at that time that N.G. be placed in a regular education, or "mainstream," classroom. A month before this, however, R.G. had informed a social worker at HASC that "[s]he would very much like to place [N.G.] in a mainstream setting next year." Social History Update 1. R.G. acknowledged to HASC's social worker that "significant support" would be necessary for N.G. in a regular education classroom, but she indicated that the idea to place N.G. in a regular education classroom had been suggested to her by a private behavioral occupational therapist, Sara Yaroslowitz, who provided services to N.G. during the 2004–05 school year, in addition to those he received at HASC. *Id.;* Tr. 2103–07; IHO Decision 14. At the impartial hearing, R.G. testified that Yaroslowitz, who herself was a parent of a child with

disabilities, "believes very much in mainstreaming" and "has mainstreamed a lot of children" with "very good results." Tr. 2103, 2106. while R.G. and her husband, J.G., had been unsure at first whether a regular education setting would be appropriate for N.G., Yaroslowitz had convinced them that N.G. needed to be "with typical children who have the input, the social, the communication and the social models" that N.G. could imitate, according to R.G. *Id.* at 2105–06. Yaroslowitz declined to testify at the hearing for religious reasons, and her credentials were unable to be verified. *Id.* at 2103–04; IHO Decision 14.

While R.G. and J.G. accepted the 2005 Extended Year IEP developed by East Ramapo's CPSE, which recommended ongoing special education services for N.G., they decided to test Yaroslowitz's recommendation that N.G. be placed in a regular education classroom with the support of a classroom aide during that same summer. Tr. 2106; SRO Decision 6. To this end, they enrolled N.G. in a Sunday class at B'nai Yoel, a Jewish yeshiva, attended otherwise exclusively by children without disabilities. Tr. 2106–07; 2127–29, 2234; Sept. 26, 2005 (Received) Letter from R.G. to S. Salzberg 2, Dist.'s Ex. B–1, ECF No. 15–10. J.G. acted as N.G.'s classroom aide. Sept. 26, 2005 (Received) Letter from R.G. to S. Salzberg 2; SRO Decision 6. Both parents testified that N.G. did "very well" at B'nai Yoel's Sunday class that summer and that the experience led them to believe that Yaroslowitz was cor-

rect to recommend mainstreaming for N.G. Tr. 2128–29, 2235.

### D. Kiryas Joel CSE's 2005–06 School Year IEP for N.G.

At some point during that summer, it was decided that N.G. would return to live with his parents in Kiryas Joel Village, although he did not actually move until November 10, 2005. IHO Decision 10. On August 12, 2005, in anticipation of N.G.'s return and with the assistance of N.G.'s service coordinator, R.G. contacted Kiryas Joel about a possible placement for N.G. during the 2005–06 school year. Referral Information 1, Dist.'s Ex. C–1; ECF No. 15–13; SRO Decision 10–11. In response, the secretary to Kiryas Joel's CSE prepared a written referral, which stated that N.G. was moving back into the district and that R.G. and his service coordinator wished to continue services similar to those he received at HASC, including special education and related therapies. Referral Information 1.

Because the beginning of the new school year was imminent, the CSE then convened a short six days later for a "requested review transfer student" meeting and to develop an IEP for N.G. SRO Decision 6. In attendance at the meeting held on August 18 were R.G. and J.G.; Sheldon Salzberg, the chairperson of the Kiryas Joel's CSE and a psychologist; Susan Gartenberg, the school principal;[8] Selma Marcovici, a speech therapist; Lucy Lotito, a vision therapist; and Hannah Gelertner,

---

8. Although she was present in her capacity as Kiryas Joel's principal, Gartenberg was certified by New York State as a regular education teacher for kindergarten through sixth grade, in addition to being certified as a special education teacher for children of all ages, a teacher of the deaf, a school administrator, and a school district administrator. Tr. 5058–61. As a teacher, she had engaged in efforts to mainstream students with disabili-

ties and, as an administrator, was very familiar with the way in which Kiryas Joel handled requests for mainstreaming. *Id.* at 5064, 5238–50. Salzberg asked her to attend the CSE meeting because, given her familiarity with the entire school, "she would know of the different classes [and] what would be the more appropriate grouping" for N.G. *Id.* at 491.

an occupational therapist. 2005–06 School Year Kiryas Joel IEP 1. No CSE member signed into the meeting as a specially designated regular education or special education teacher.[9] In addition, R.G. waived in writing the statutory requirement that an "additional parent member" be present.[10] Waiver of NYS Parent Member Participation 1, Dist.'s Ex. B–1; ECF No. 15–10.

In formulating its IEP for N.G., Kiryas Joel's CSE reviewed N.G.'s 2005 Extended Year IEP prepared by East Ramapo's CPSE and all of the documents on which it relied, including the educational review prepared by Motechin, the speech and language therapy review prepared by Epstein, the occupational therapy review prepared by Dembitzer, the physical therapy review prepared by Gottesfeld, the vision therapy review prepared by Forzono, and the psychological evaluation from July 2003. 2005–06 School Year Kiryas Joel IEP 1–2. The CSE noted that these "evaluations recommended special education in a small group setting because of [N.G.'s] developmental delays in areas of language, physical and social development." *Id.* at 1. In addition to these materials, the CSE considered N.G.'s medical records, dated August 17, 2004, and a social history evaluation conducted by Joy

stimmel of Kiryas Joel on August 16, 2005, in anticipation of the meeting. *Id.* at 2; Social History Evaluation; Referral Information 2. Gartenberg testified that, when asked repeatedly whether the evaluations and other documents accurately described their son, R.G. and J.G. confirmed that they did. SRO Decision 19; IHO Decision 37–38.

Based on this information, the CSE "recommend[ed] that [N.G.] be classified as multiply disabled because of his vision deficits and developmental delays and that he be placed in a special class program with related services including speech, physical and occupational therapy and vision services." 2005–05 School Year Kiryas Joel IEP 2. Specifically, the IEP consisted of a special education classroom with a teacher-student-aide ratio of 8:1:1 for six hours each day; two thirty-minute sessions of individualized speech and language therapy each week; one thirty-minute session of group speech and language therapy each week; one thirty-minute session of individualized occupational therapy each week; one thirty-minute session of group occupational therapy each week; two thirty-minute sessions of individualized physical therapy each week; one thirty-minute session of group physical therapy

**9.** Because Kiryas Joel does not offer a regular education, the district has asked the New York State Education Department, but has not received an answer, whether it must employ a regular education teacher to sit on its CSE and participate in IEP meetings. Tr. 494. Where it is clear at the outset that mainstreaming may be appropriate for a child, and where that child's parents have already registered him or her at a private yeshiva (which is often the case), Kiryas Joel's CSE will invite the yeshiva's teachers to attend the IEP meeting. *Id.* at 491, 493–94. Because the teachers are not employees of the district, Kiryas Joel cannot guarantee their attendance. *Id.* at 491. For this reason, Kiryas Joel employs community liaisons who visit the local yeshivas to "see what impact or

what aspects, what things are going on in the regular classroom, in the typical classroom." *Id.* at 492–93; *see id.* at 5158. The liaisons, however, do not appear to attend IEP meetings or sit on the CSE. *Id.* at 5607–08.

**10.** R.G. first testified that she was not given a meaningful choice in signing the waiver form, as she was told Kiryas Joel generally proceeds without a parent member for confidentiality reasons, but that she "would have wanted" a parent member had she been given the choice. Tr. 3240–43. She later stated that she was told she had a right to have a parent member present, that she did not tell anyone that she wanted a parent member present, and that she understood she was waiving her right. *Id.* at 3243, 3245–47.

each week; and one thirty-minute session of individualized vision therapy each week. *Id.* at 2. The IEP also included special transportation for N.G. *Id.* These recommendations were nearly identical to those contained in N.G.'s 2005 Extended Year IEP. The IEP stated that N.G. was ineligible for extended school year services, as Kiryas Joel's summer program had ended on August 12, 2005, the same day that R.G. contacted the district about her son. SRO Decision 7 & n. 4.

The CSE did not recommend that N.G. undergo an assistive technology evaluation because, according both to Salzberg and Marcovici, N.G.'s speech and language skills were so basic and underdeveloped that he had not reached the stage where an assistive technology would be useful. IHO Decision 60, 91. From N.G.'s evaluations, Salzberg was aware that N.G. had been using PECS, and while his use of PECS was not discussed at the meeting, this was because PECS, among other assistive technologies, was already incorporated into the classroom at Kiryas Joel as "a natural part of what's used with all children with the type of language difficulties that [N.G.] has." Tr. 7305–06. Only if the CSE knew that a child would require some special education equipment, device, supplementary aid, service, or accommodation beyond what the district already had in place would it explicitly be included in a child's IBP. *Id.* at 568–70, 7305–06. In effect, "the modifications are part of the program" whenever the CSE recommends placement in its self-contained special education classroom. *Id.* at 568.

As East Ramapo's CPSE did, Kiryas Joel's CSE considered for "a long time," but ultimately rejected, an "integrated" approach combining special and regular education. Tr. 6960; 2005–06 School Year Kiryas Joel IEP 3. At the meeting, N.G.'s parents indicated that they "ha[d] been advised to consider an inclusive placement to expose [N.G.] to a typical educational setting" and that they sought "support for a placement in the school of his siblings," B'nai Yoel. 2005–06 School Year Kiryas Joel IEP 1; Tr. 6959–60, They explained that N.G. was already attending B'nai Yoel on Sundays in a classroom with students without disabilities.[11] SRO Decision 7. R.G. testified that she told the CSE about Yaroslowitz's recommendation that N.G. be mainstreamed and that she had done her own research into mainstreaming, which "show[ed] that children who are with typical peers develop ... better than children that are in a special education classroom." Tr. 2129. Both R.G. and J.G. communicated to the CSE that they wanted N.G. to be educated alongside children without disabilities, specifically at B'nai Yoel. *Id.* at 2127–28, 2235, 3167.

The CSE, however, concluded that "[n]one of the reports or observations [they] reviewed suggest that this would be appropriate." 2005–06 School Year Kiryas Joel IEP 1. Salzberg testified that all of the professionals on the CSE agreed that N.G.'s "levels of functioning, the performance all made sense that a self-contained special education program would be appropriate for him." Tr. 7286. Gartenberg stated that at the end of the IEP meeting

---

11. This fact is construed in favor of N.G.'s parents. Salzberg, however, testified that N.G.'s parents informed the CSE that N.G. was attending "a program on Sundays with typically developing children," but when he said to them, "That's a play program, that's not a school program," they did not correct him. Tr. 7297. Because of this, at the time

of the IEP meeting, Salzberg did not realize that this program was at B'nai Yoel and, therefore, did not believe it was "relevant" to whether mainstreaming was appropriate for N.G. *Id.* Gartenberg likewise testified that at the IEP meeting N.G.'s parents did not inform the CSE of his ongoing, part-time attendance at B'nai Yoel. *Id.* at 5197.

she did not believe "at all" that B'nai Yoel would be a good placement for N.G. because he lacked social, verbal, and daily living skills (i.e., toilet training) that "he so desperately needed" "to be to be really mainstreamed properly, not even mainstream[ed], to be a student." *Id.* at 5194. She testified that her view was shared by the rest of the CSE and that "it wasn't a close call." *Id.* at 5195. Marcovici, who directs Kiryas Joel's speech and language department, reiterated this, stating that "the whole team felt that [B'nai Yoel] would not be appropriate" because N.G. "would not be able to learn and make the kind of progress we would want from him in a big [classroom] environment where the teaching was directed towards normally developing children and it wasn't being modified so that he could learn." *Id.* at 6411–12. According to N.G.'s father, J.G., the CSE made clear that "[n]o matter what kind of private school, it would not work out, no matter what." [12] *Id.* at 2236.

As a "compromise" solution, however, the CSE proposed placing N.G. in a special education classroom at Kiryas Joel for the first few weeks of September, during which time the district could observe him there as well as later on in his B'nai Yoel classroom.[13] *Id.* at 5190–91, 7289–90; 2005–06 School Year Kiryas Joel IEP 2–3. After conducting these observations, the CSE stated that it would be willing to reevaluate N.G.'s placement going forward. 2005–06 School Year Kiryas Joel IEP 3. Salzberg similarly testified that Kiryas Joel "would [have] be[en] happy to consider [placement at B'nai Yoel] but we needed to have evidence that it was not

going to put him into more stress or be at such a change where he wouldn't grow or develop." Tr. 7290, Salzberg also stated, and Gartenberg confirmed, that, despite indicating that they would provide such evidence, likely in the form of a report by Yaroslowitz, R.G. and J.G. never did so.[14] *Id.* at 5193–94, 7287–89. Salzberg indicated that, if there had been some evidence to persuade the professionals on the CSE of the appropriateness of a mainstream program, he "absolutely" would have offered it to N.G., but that based on the information that the committee had at the time of the IEP meeting—as well as evaluations of N.G. undertaken since then—he continued to believe that N.G.'s "needs would be best met in a self-contained [special] education program." *Id.* at 7447.

### E. N.G.'s Related Therapies Provided by Kiryas Joel During the 2005–06 School Year

In mid-September, before deciding to enroll N.G. full-time at B'nai Yoel for the 2005–06 school year, R.G. observed the self-contained, special education classroom at Kiryas Joel. *Id.* at 2933–34; Sept. 26, 2005 (Received) Letter from R.G. to S. Salzberg 1. She observed that "the children were not really—were not singing along, the teachers were the ones doing all the communication, nothing by the children, no communication between the children." Tr. 4342. In an letter to Salzberg marked as received by Kiryas Joel on September 26, 2005, R.G. stated that the people she met when visiting Kiryas Joel "were very nice," but that, "unfortunately, we cannot accept this place for [N.G.] be-

12. J.G. stated that, within Kiryas Joel Village, the only option for N.G. "to be with typical children" is at a yeshiva. Tr. 2236.

13. B'nai Yoel's school year was scheduled to begin in October after the Jewish holidays, such that, by attending Kiryas Joel on a trial basis in September, N.G. would not have been

missing the beginning of the year at B'nai Yoel. Tr. 5191, 5196.

14. Gartenberg also expressed her doubt that Yaroslowitz, whom she knew personally and with whose credentials she was familiar, was qualified to determine whether a mainstream placement was appropriate for N.G. Tr. 5193.

cause it does not meet his individual needs, and that includes social, communication, and behavioral needs." Sept. 26, 2005 (Received) Letter from R.G. to S. Salzberg 1. Referring to the Kiryas Joel classroom as "far too restrictive," she continued to say that "N.G. has proven to us that with appropiate [sic] support he can make meaningful progress and be very happy in a mainstream school." *Id.* at 1–2, R.G. stated that, beginning September 23, 2005, the family would seek funding from Kiryas Joel to cover their expenses related to N.G.'s tuition at B'nai Yoel, his classroom aide in that setting, his transportation to and from school, and a home-based "intervention" program that they planned to implement shortly.[15] *Id.* at 2–3.

On September 27, 2005, Salzberg responded to this letter from R.G. received by Kiryas Joel the day before. SRO Decision 8. Salzberg stated that Kiryas Joel would neither pay N.G.'s tuition expenses at B'nai Yoel nor provide therapy services at B'nai Yoel because the school was "not an appropriate setting."[16] *Id.* He also indicated that the CSE's proposed IEP would remain as written, that the district believed the IEP offered N.G. a free appropriate public education in the least restrictive environment, and that R.G. and J.G. could contact Kiryas Joel's superintendent, Steven Bernardo, to arrange a resolution meeting. *Id.*

In October 2005, R.G. and J.G. requested an impartial hearing, as detailed below. *See* Oct. 6, 2005 Demand for Due Process

Letter ("Due Process Demand") 2–3, Dist.'s Ex. D, ECF No. 15–15. On November 1, 2005, Kiryas Joel offered to provide N.G.'s related services and transportation, consistent with its recommendations in the 2005–06 School Year IEP. IHO Decision 21; SRO Decision 8. The district informed R.G. and J.G. that their "acceptance of the offer would not be conditioned on a waiver of any rights not already preserved by their impartial hearing filing." SRO Decision 8, Instead, Kiryas Joel stated its intent was "merely . . . to immediately provide the child with what [the district] believes are appropriate [pendency] services." *Id.*

Nearly a month later, on November 29, 2005, R.G. and J.G. responded by letter to Bernardo asking him to send by facsimile or mail the district's proposed plan and schedule for related services and therapies. IHO Decision 21. Kiryas Joel responded that same day, stating that it would "make every effort to accommodate the student's academic schedule during the school day," but that R.G. and J.G. should contact Bernardo "by phone in the immediate future so that the provision of services can be determined without further delay." *Id.* at 21–22.

On December 22, 2005, R.G. and J.G. informed Kiryas Joel by letter of their readiness to accept pendency services, requesting that they be provided between 9:00 and 10:00 A.M. and after 2:30 P.M. *Id.*; Tr. 5311. The following day, Kiryas Joel by letter again asked N.G.'s parents

---

15. Both the IHO and the SRO concluded that, until N.G. returned to live with his parents on November 10, 2005, he was being transported to B'nai Yoel by his father and not the school bus. IHO Decision 20; SRO Decision 8. In fact, B'nai Yoel has explicitly refused any transportation services provided by Kiryas Joel on the grounds that "the whole existence of the district is against the Jewish faith and in contrast with the way our forefathers had accepted the Torah from Mount Sinai and

sacrificed for it for so many years." Apr. 24, 1996 Letter from B'nai Yoel to Kiryas Joel (English translation from Yiddish) 2, Dist.'s Ex. C–2, ECF No. 15–14.

16. At the impartial hearing, Salzberg testified that the reason Kiryas Joel would not provide related therapy sessions at B'nai Yoel was that the district had faced difficulties in arranging the provision of services there in the past. Tr. 829.

to contact Bernardo to arrange the services, which the district was "prepared to commence ... immediately." IHO Decision 22. On January 5, 2006, Gartenberg followed up with a call to R.G. to discuss scheduling N.G.'s related services. Jan. 8, 2006 Letter from R.G. to S. Gartenberg 1, Dist.'s Ex. B–3, ECF No. 15–12.

In a letter dated January 8, 2006, R.G. requested that Kiryas Joel send by facsimile its proposed therapy schedule, asked that services be provided at B'nai Yoel before the school day, requested that all proposed group therapy sessions be changed to individualized sessions so as to "not 'waste' (not exactly) [N.G.'s] precious time," and inquired whether the district would pay for N.G.'s recently-begun aqua therapy program. *Id.* at 1–3. In response to a facsimile from Bernardo including Kiryas Joel's proposed schedule for related services, R.G. sent another letter on January 9, asking that the time of some of the therapy sessions be changed and accepting those services being offered at "the right time." Jan. 9, 2006 Letter from R.G. to B. Bernardo 1, Dist.'s Ex. B–3, ECF No. 15–12. Before the IHO, R.G. acknowledged that Kiryas Joel had to change other students' schedules in order to accommodate her requests for N.G. Tr. 3995.

Kiryas Joel provided N.G. with the first sessions of individualized speech and language and occupational therapies on January 17, 2006; the first session of vision therapy on January 19; and the first session of individualized physical therapy on January 25. IHO Decision 23. N.G.'s parents rejected all forms of group therapy but accepted all individualized therapies, except for one physical therapy session that conflicted with N.G.'s privately obtained aqua therapy. *Id.;* SRO Decision 8; Tr. 2905. In a letter dated April 6,

2006, the parents discontinued Kiryas Joel's provision of vision services, only to then request on May 10, 2006, that the district's vision therapist change the time of the session to accommodate revisions to N.G.'s schedule. IHO Decision 23–24.

## F. 2005–06 School Year at B'nai Yoel

On September 19, 2005, R.G. and J.G. arranged for N.G. to attend B'nai Yoel on a full-time basis for the 2005–06 school year. SRO Decision 8; IHO Decision 26, In making this arrangement, they were aware that B'nai Yoel did not provide special education services, including classroom aides. IHO Decision 26. They neither discussed with B'nai Yoel how N.G.'s disabilities would be accommodated nor provided the yeshiva with information about his related services.[17] *Id.* N.G. was the only child with disabilities in his class. Tr. 4204.

N.G.'s classroom teacher at B'nai Yoel, Rebbe Gruber, had no special or regular education teaching certification or license. *Id.* at 2800. Prior to teaching N.G., he had never taught a child with disabilities. *Id.* He did not receive copies of N.G.'s previous educational and therapy evaluations, had not seen the IEPs prepared for N.G. by Kiryas Joel's CSE and East Ramapo's CPSE, and was generally unfamiliar with the concept of an IEP. *Id.* at 2808–11. He did not speak with N.G.'s privately obtained therapists or receive reports prepared by them. *Id.* at 2812–13. The extent of his instruction on "how he should handle [N.G.]" in the classroom came from J.G., N.G.'s father. *Id.*

Initially, J.G. accompanied N.G. each day to B'nai Yoel as his classroom aide. Sept. 26, 2005 (Received) Letter from R.G. to S. Salzberg 2; IHO Decision 27. J.G. testified that he had experience working in

---

17. R.G. "didn't feel it was necessary" to provide copies of the IEP proposed by Kiryas Joel, the IEP proposed by East Ramapo, or any of N.G.'s evaluations to any of the staff at B'nai Yoel or to any of N.G.'s privately obtained aides or therapists. Tr. 3277–81, 3287.

this capacity with other children with disabilities, but that he had no formal training. IHO Decision 27. While N.G. required assistance with basic functions like eating and toileting, J.G. believed that "if he should make meaningful progress it is better that he should have an aid[e] there and that he is playing together with the children, that he is playing with them," than be isolated in a special education classroom. Tr. 2217. J.G. therefore focused on ways to facilitate N.G.'s social interaction, like assisting him with building blocks or prompting him to share his blocks with the other children. *Id.* at 635–36.

In mid-November 2005, N.G.'s parents hired Rebbe Bleich as N.G.'s new classroom aide, and in April 2006 Joel Lebovits replaced Bleich. IHO Decision 13–14. While Bleich had no training or experience working with children with disabilities, Lebovits had minimal experience in this area. Tr. 2211–12, 1774–76. N.G. spent time each school day outside of the classroom working one-on-one with Bleich. *Id.* at 2822, 2825, 2835. Bleich was exclusively responsible for these individualized sessions and generally used the time to review with N.G. the alphabet, numbers, and the parsha, which is a story from the Torah. *Id.* at 2823, 2832. There was no formal communication structure between Gruber and Bleich regarding N.G.'s tasks or progress during the individualized sessions, and Gruber did not supervise or otherwise instruct Bleich. *Id.* at 2823–27. The situation was identical with Bleich's replacement, Lebovits. IHO Decision 83.

Salzberg, the chairperson of Kiryas Joel's CSE, observed N.G. in his classroom of twenty-two students at B'nai Yoel in late November 2005. *See* Dec. 8, 2005 Observation of N.G. by S. Salzberg, Dist.'s Ex. B–1, ECF No. 15–10. He testified that N.G. followed classroom routines but "[n]ot of his own volition." Tr. at 445. When his aide spoke to him, N.G. smiled and wagged his feet beneath him in an excited response. *Id.* at 446, 453. When the aide brought over toys and other children to play with N.G., however, the children instead began playing with the aide, and N.G. was "still off by himself." *Id.* at 446. N.G. exhibited no self-injurious, aggressive, tantruming, screaming, or crying behavior in the classroom, but when the students were reciting a prayer, he failed to respond, whether verbally or by gesture (such as covering his eyes, as the other children did). *Id.* at 448–49; Dec. 8, 2005 Observation of N.G. by S, Salzberg 2, 5. N.G. rocked alongside his peers during the prayer, but he rocked by himself at other times as well, like when he was waiting for lunch to be served, leading Salzberg to question whether his rocking during the prayer was actually responsive or a natural tendency. Tr. 451–56. Contrary to Gruber indicating that N.G. could make choices or indicate his understanding of concepts by pointing to pictures, Salzberg "did not see anything like that" and "didn't believe it because [he] didn't see it." *Id.* at 7475–78. Salzberg stated he would have been inclined to agree that the other children in the classroom could provide N.G. with good language models if he had "thought that [N.G.] was listening to them and that it wasn't going past him." *Id.* at 450. Salzberg concluded that N.G. would have benefitted instead from educators who "consciously" created instruction designed to meet his needs.[18] *Id.* at 451.

---

18. Salzberg's written report of his observations stated, "It is critical that [N.G.]'s parents understand that his needs, in this community, can be more appropriately addressed in the public school special class program [at Kiryas Joel] where his curriculum can be individualized, where he would be provided with integrated therapy, and where he would be provided with academic activities that will stimulate his development. Without appro-

Fred Chaim Weiss, a certified school psychologist employed by Kiryas Joel, accompanied Salzberg on his visit to observe N.G.'s placement at B'nai Yoel. *Id.* at 7093. Weiss remarked that, while the other children were being guided by the teacher in a blessing and prayer, "N.G. was basically staring." *Id.* at 7094. He occasionally, but only episodically and not at all consistently, followed or mimicked what the others were doing or responded to direction from Gruber.[19] *Id.* at 7094, 7096, 7214, 7224–25. Weiss mused that "[t]he sense was he eat there and he really did not interact with the other children. Even though other children at times came over to him and engaged him in conversation, he wouldn't respond. One child actually lifted his hand and was banging it on the table and he didn't seem to mind." *Id.* at 7095. N.G. did not engage in playing with toys, merely holding them in his hand, and "there was nothing that [his aide] did to encourage other children to play with him." *Id.* at 7095, 7098. N.G. correctly identified a picture of an ambulance when asked. *Id.* at 7095–96. Like Salzberg, Weiss believed, based on his observations, that B'nai Yoel was not an appropriate educational setting for N.G. because, as a child with limited cognitive functioning, he "require[d] a program which has a minimum amount of distraction, much more focus and intentional transmittal of the material to him." *Id.* at 7104.

There was considerable testimony at the impartial hearing, however, as to N.G.'s progress during the 2005–06 school year at B'nai Yoel. B'nai Yoel's principal, Rabbi Mechel Falkowitz, emphatically referred to it as "much more than [one-] hundred percent success" and a much bigger change than he expected to see in such a short time. *Id.* at 73, 76. He testified that, based on his weekly conversations with Bleich, "I wouldn't believe it, how it could be so much progress than before when [Bleich] took him, when he started with him, that he wouldn't believe that he would make so much progress." *Id.* at 76. N.G. was capable of understanding what was said to him, following directions, socializing and playing with the other children, making eye contact, asking to use the restroom, sitting "nicely" when eating or listening to a story, and showing respect for his teacher like the other students. *Id.* at 72–76, 91, 93. Falkowitz acknowledged that N.G. remained unable to speak, but stressed that he "motion[ed] like all the other children, because he want[ed] to copy all the other children, to be the same as them." *Id.* at 92–93.

J.G. similarly remarked on N.G.'s improved ability to listen, mimic, and follow directions. *Id.* at 2240–42. He stated that N.G. was expressing his desire "to communicate with the family, even the neighborhood outside on the street," and "to do whatever all the typical children [were] doing." *Id.* at 2238–29. Whereas before other children had been unfriendly to him, now they engaged him in their games that involved tasks like rolling dice. *Id.* J.G. believed his advancements were attributable less to him getting older and more to him imitating and adopting the "more appropriate behavior" of his peers. *Id.* at 2243.

---

priate education, [N.G.] will be unprepared for independent living and learning." Dec. 8, 2005 Observation of N.G. by S. Salzberg 6.

**19.** Weiss stated that "mimicking is only a very, very low level of—it's apparently, it doesn't indicate understanding, it doesn't indicate any deeper, or knowledge based understanding from deduction or induction from one either to another, it only parrots other children or parrots what the rebbe or the teacher is saying so ... [it is] nice to have good models, but the models have to be intentionally teaching to his level of understanding." Tr. 7227.

Sara Kahn, an educational and behavioral programming consultant hired by N.G.'s parents, observed him in his B'nai Yoel classroom for two hours on November 9, 2005. *Id.* at 616, 619, 648; Nov. 9, 2005 Independent Evaluation of N.G. by S. Kahn, Dist.'s Ex. B–1, ECF No. 15–10. Kahn's observations were limited to what she could see either through the door or window because Gruber was uncomfortable with her presence in the classroom. Tr. 619. She noted that N.G. was able to follow and imitate his peers, including by covering his eyes during prayer, and that "children who have strong imitation skills, as [N.G.] appeared to, are children that I think would be able to benefit from being in an environment with other children who are more advanced than them." *Id.* at 629; Nov, 9, 2005 Independent Evaluation of N.G. by S. Kahn 1. His fine motor delays made it difficult for him to feed himself or push small blocks together, despite the fact that "he clearly cognitively understood what to do." Tr. 634. She acknowledged that N.G. was nonverbal, but although he lacked "the ability to expressively communicate," he appeared to understand and respond appropriately to direction. *Id.* at 632–34. "Based on the severity of his delay and his inability to acquire language from an incidental setting" like the classroom, Kahn recommended a 1:1 home-based intervention program, overseen by a special education teacher and involving a speech pathologist, if N.G. were to acquire any speech and language skills, particularly because none of the instruction at B'nai Yoel was targeted at expressive language development.

Nov. 9, 2005 Independent Evaluation of N.G. by S. Kahn 2; Tr. 636, 681. Overall, N.G. exceeded Kahn's expectations, which she had formulated based on some of N.G.'s past evaluations that his parents provided to her. *Id.* at 616, 636. She believed that the B'nai Yoel classroom offered him an appropriate place to develop his social skills, while recognizing that she observed no academic instruction.[20] *Id.* at 636–37, 668.

A speech and language pathologist, Steven Blaustein, retained by N.G.'s parents also evaluated N.G. for two hours at his office on December 15, 2005. *Id.* at 859. He commented that, while N.G. was using the word "nein" and perhaps could develop other single functional words (although at the time he was unable to make even simple sounds), "[t]here are some severe deficits here, [and] without an intensive, intensive program of really working on all of these areas, it's difficult to predict up how far one could go." *Id.* at 868; IHO Decision 64. Blaustein observed that it was "extremely difficult for [N.G.] to communicate with his peers." Tr. at 883. He believed it to be necessary that N.G. utilize an augmentative nonverbal communication system—such as PECS—so that he could begin to express his needs in a way that did not necessitate sounds which he could not produce.[21] IHO Decision 64. While he stated that it could be appropriate to place N.G. in a regular education classroom on a part-time basis, provided he had a high level of support from a special education "itinerant" teacher, Blaustein conceded that N.G.'s inability to communi-

---

**20.** Kahn defined "a mainstream environment as one where the children present have appropriate language and social models for their age," focusing on the nature of the children, rather than the characterization of the classroom. Tr. 685.

**21.** The IHO found that Marcovici, Kiryas Joel's speech and language department head, had made this same recommendation to N.G.'s parents, but that they rejected it because they "believed that the use of an augmentative [nonverbal] communication system would inhibit the child from speaking." IHO Decision 87.

cate would not necessarily be augmented by—and, in fact, might be frustrated by—exposure to typically developing peers whose "expressive language skills [were] much beyond his." *Id.* at 65–66. Having not seen N.G. in his B'nai Yoel classroom, Blaustein declined to render an opinion whether it was an appropriate environment for N.G. *Id.* at 66; Tr. 909. He did state, however, that N.G. would benefit from a smaller class setting (i.e., no more than 14 students, assuming that he had support), and that his private therapy program would be successful only if reinforced in his classroom. IHO Decision 67.

### G. 2005–06 Home–Based Intervention Program

To complement his school day at B'nai Yoel, N.G.'s parents instituted a home-based intervention program for him that involved a private tutor and various forms of privately obtained therapy. Yaroslowitz helped oversee this program, although she did not observe or work with N.G. on a consistent basis. Tr. 4233, 4245; IHO Decision 14. The other individual whom R.G. and J.G. consulted to create the home-based intervention program was Sura Gitty Weiss, a close familial relative of theirs. Tr. 2006–07. Gitty Weiss, who had no special education license or certificate but did have some experience teaching children with disabilities, provided consultation services by phone.[22] *Id.* at 1025, 2002–04, 2009, 2016. Because she did not live in Kiryas Joel Village and because she was not being paid, Gitty Weiss did not observe N.G. in person more than once.

*Id.* at 2008–09, 2012. Her recommendations, therefore, were based on what N.G.'s parents told her about his abilities. *Id.* at 2015, 2020. She testified that she was proud of her relatives because, without any background in special education, "they understand what their child needs very, very well." *Id.* at 2018.

Through the home-based intervention program, N.G. had a morning tutor, Raizel Falkowitz, who had no special education license or certificate but previously had worked with an autistic child. *Id.* at 2110–12; IHO Decision 82. Falkowitz focused mainly on N.G.'s behavioral issues, life skills (i.e., dressing), and speech.[23] Tr. 209. N.G. also received privately obtained occupational therapy, sensory integration therapy, and speech and language therapy. IHO Decision 15, 49; Tr. 205–07. The home-based intervention program and its accompanying therapy sessions, however, contained no written goals or objective criteria for measuring N.G.'s progress toward a goal. IHO Decision 15. Furthermore, there was little, if any, coordination between the privately employed consultants, therapists, and classroom aides, much less between all of them and the Kiryas Joel-employed therapists providing N.G.'s pendency services. IHO Decision 16, 77, 81.

### H. Procedural Posture
#### 1. Before the IHO

In their due process demand notice, R.G. and J.G. requested an impartial hearing seeking declaratory relief, reimbursement for tuition at B'nai Yoel and privately

---

**22.** Gitty Weiss's husband, Nechemia Weiss, was also present for the telephone consultations. Tr. 2020–21. Gitty Weiss testified that her husband has a special education license, but she was unsure of the details. *Id.* at 2023–24.

**23.** The IHO also found that Falkowitz babysat N.G. and accompanied him to his therapy

sessions. IHO Decision 81. The IHO further noted that, "[w]hen questioned about her time sheets, Ms. Falkowitz was unable to differentiate between time she spent working with [N.G.] in the home program, time she accompanied [N.G.] to related service providers, and time she spent babysitting [R.G. and J.G.'s] children." *Id.* at 82.

obtained services, and compensatory education for N.G.'s pendency entitlements. Due Process Demand 2–3. On April 27, 2006, in amending their demand notice, N.G.'s parents withdrew their request for tuition costs. Apr. 27, 2006 Letter ("Amended Due Process Demand") 1, Dist.'s Ex. D, ECF No. 15–15. They clarified that they were seeking declaratory relief that Kiryas Joel failed procedurally and substantively to provide N.G. a free appropriate public education in the least restrictive environment; declaratory relief that Kiryas Joel failed to honor N.G.'s pendency entitlements in a timely manner as well as compensatory relief for the gap in pendency services; declaratory relief that equitable considerations, if any, weigh in favor of N.G.'s parents; and reimbursement for the costs of N.G.'s various classroom aides, the home-based intervention program, extended day services, and transportation. *Id.* R.G. and J.G. also claimed compensatory relief for Kiryas Joel's "failure to offer any extended day services, and its related failure to offer adequate levels and types of speech and language therapy, occupational therapy, and physical therapy." *Id.* Finally, they sought an assistive technology evaluation. *Id.*

The IHO denied N.G.'s parents' application for relief, except that she ordered Kiryas Joel to provide N.G. with an assistive technology evaluation and to reimburse his parents for expenses incurred as a result of the gap in N.G.'s pendency entitlements from November 10, 2005 to January 5, 2006. IHO Decision 127–28.

### 2. Before the SRO

On appeal to the New York State Education Department's Office of State Review (the "OSR"), N.G.'s parents contested the IHO's decision to deny them reimbursement for privately obtained therapy sessions, a classroom aide, a home intervention program, and extended day services. SRO Decision 1, 15. Kiryas Joel cross-appealed the decision insofar as it determined that the district failed to provide pendency services for part of the 2005–06 school year. *Id.*

The SRO largely concurred with the IHO's decision.[24] *Id.* at 21. He modified the order that Kiryas Joel conduct an assistive technology evaluation, however, to require this evaluation only if the district had not already undertaken it. *Id.* He also annulled the order that Kiryas Joel reimburse the parents for expenses incurred with respect to N.G.'s pendency entitlements, finding that the district's delay in delivering related therapies was attributable to N.G.'s parents. *Id.*

### 3. Motions for Summary Judgment

Before this Court is N.G.'s parents' civil action, pursuant to 20 U.S.C. § 1415(i)(2), challenging the SRO's decision and seeking (1) declaratory relief that Kiryas Joel

---

**24.** Before addressing the merits of N.G.'s parents' petition, the SRO discussed several procedural matters. First, he declined to accept additional documentary evidence presented by R.G. and J.G. that was not available at the time of the impartial hearing on the basis that it was not necessary to render a decision. SRO Decision 1–2. second, he admonished N.G.'s parents (rather, their counsel) for failing to support the assertions in their pleadings and memorandum of law with appropriate references to the hearing record; for raising procedural and substantive issues in their memorandum not raised in their petition for review; and for failing to adequately identify the IHO's findings and conclusions being appealed. *Id.* at 2. On these grounds, the SRO exercised his discretion to dismiss the petition. *Id.* He also refused to consider the first six pages of R.G. and J.G.'s reply and answer to Kiryas Joel's cross-appeal for failing to respond to the procedural defenses in the answer and raising arguments beyond the scope of a permissible reply. *Id.* at 3. In spite of his dismissal of the petition, the SRO, having "reviewed the entire hearing record," elected to reach the merits. *Id.*

failed to offer N.G. a free appropriate public education in the least restrictive environment; (2) compensation for the cost of N.G.'s unilateral placement supports (i.e., privately obtained therapy, various classroom aides, a home intervention program, and extended day services); and (3) compensatory education equal to any lapses in N.G.'s entitlement to pendency services. Pls.' Compl. 7, ECF No. 1. By notice of motion dated February 3, 2009, N.G.'s parents moved for summary judgment or "modified de novo review." Pls.' Mot. Summ. J., ECF No. 8. On May 11, 2009, Kiryas Joel brought a cross-motion for summary judgment, Def.'s Cross–Mot. Summ. J., ECF No. 14. The parties have agreed to treat the matter as a "case stated" under Rule 56 of the Federal Rules of Civil Procedure. *See, e.g., E.G. v. City Sch. Dist. of New Rochelle,* 606 F.Supp.2d 384, 386 n. 2 (S.D.N.Y.2009) (describing the case stated procedure).[25]

## II. RULINGS OF LAW

### A. Standard of Review

■■■ In IDEA cases, summary judgment "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.,* 554 F.3d 247, 252 (2d Cir.2009) (quoting *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.,* 397 F.3d 77, 83 n. 3 (2d Cir.2005)). "Federal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties."[26] *Grim v. Rhinebeck Cent. Sch. Dist.,* 346 F.3d 377, 380 (2d Cir.2003) (quoting 20 U.S.C. § 1415(i)(2)(B)).

---

**25.** Derived from the procedures of the courts of the Commonwealth of Massachusetts, *see, e.g., Parker v. Morrell,* 59 Mass.App.Dec. 34 (Mass.Dist, Ct.1976), the "case stated" procedure is firmly established in the jurisprudence of the First Circuit. *See, e.g., Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir. 1985); *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 n. 7 (1st Cir.1992); *Bunch v. W.R. Grace & Co.,* 532 F.Supp.2d 283, 286–87 (D.Mass.2008). It is a most helpful procedural device. In this session of the Court, it works like this: whenever cross-motions for summary judgment reveal that the relevant facts appear without significant dispute, the courtroom deputy clerk offers the parties to treat the case as a case stated. Should they accept, as was the case here, the Court treats the undisputed facts as the established record and draws the reasonable inferences therefrom without the necessity of drawing adverse inferences against each moving party, *see* Fed. R. Civ. p. 56. The facts of the case being established, the Court affords each party thirty minutes for final argument (not the usual ten minutes per party when hearing argument on a motion). In due course, the Court enters findings and rulings as required by Federal Rule of Civil Procedure 52(a).

**26.** The First, Third, and Ninth Circuits have held that it is improper to consider retrospective evidence of a student's performance in evaluating the appropriateness of an IEP. *See Adams v. Oregon,* 195 F.3d 1141, 1149 (9th Cir.1999); *Carlisle Area Sch. v. Scott P. ex rel. Bess P.,* 62 F.3d 520, 530 (3d Cir.1995); *Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 992 (1st Cir.1990). The Second Circuit has not yet joined this debate. *See D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.,* 430 F.3d 595, 598–99 (2d Cir.2005) (recognizing the controversy over whether "it is error to consider retrospective evidence in assessing the substantive validity of an IEP" but declining to rule on it); *see also Mamaroneck,* 554 F.3d at 251 n. 1 (finding resolution of the issue unnecessary in the context of the case). Notably, however, the Second Circuit recently relied on retrospective evidence to uphold a parent's choice of private placement. *See Frank G. v. Board of Educ.,* 459 F.3d 356, 366 (2d Cir.2006) ("[The child's] social and academic progress, and his score on the Stanford Achievement Test, support the appropriateness of the placement."); *see also Gagliardo v. Arlington Cent. Sch. Dist.,* 489 F.3d 105, 115 (2d Cir.2007) ("[A] child's progress [in a private placement] is relevant to the court's review.").

Due to the nature of the inquiry, the "role of the reviewing court ... is circumscribed." *Muller ex rel. Muller v. East Islip Union Free Sch. Dist.*, 145 F.3d 95, 101 (2d Cir.1998). Courts "must give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Grim*, 346 F.3d at 380 (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998)); *see Board of Educ. v. Rowley*, 458 U.S. 176, 204–08, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). "Although school officials' decisions are subject to 'independent' judicial review, the 'responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers.'" *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir.2008) (quoting *Walczak*, 142 F.3d at 129); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005). Federal courts must not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034. Where there is disagreement between the IHO and the SRO, even in part, a court must give due weight to the factual conclusions of the SRO as the final word of the state authorities. *Karl ex rel. Karl v. Board of Educ.*, 736 F.2d 873, 877 (2d Cir.1984).

## B. IDEA Overview

Under the IDEA, states receiving federal funds must provide "all children with

In the absence of Second Circuit precedent to the contrary, this Court believes the most equitable result is to consider only the information that was before Kiryas Joel's CSE at the time of N.G.'s IEP meeting in determining whether the CSE offered him a free appropriate public education. *See J.R. & B.R. ex rel. S.R. v. Board of Educ.*, 345 F.Supp.2d 386, 395 (S.D.N.Y.2004) ("[T]he determination [that the IEP at issue is reasonably calculated to enable the student to receive educational benefits] ... is necessarily prospective in nature; we therefore must not engage in Monday-morning quarterbacking guided by our knowledge of [the student's] subsequent progress at [her school], but rather consider the propriety of the IEP with respect to the likelihood that it would benefit [her] at the time it was devised.").

On the other hand, but consistent with *Frank G.* and *Gagliardo*, the equities weigh in favor of considering N.G.'s progress at B'nai Yoel during the 2005–06 school year—because the record does reflect some progress favorable to the parents' position—in assessing whether this private placement was appropriate. *But cf. A.S. v. Trumbull Bd. of Educ.*, 414 F.Supp.2d 152, 171 (D.Conn.2006) (declining to decide the propriety of supplementing the record with retrospective evidence where "the supplementation requested in this case would, on balance, prove unhelp-

ful"); *C.B. v. New York City Dep't of Educ.*, No. 02 CV 4620, 2005 WL 1388964, at *18 (E.D.N.Y. Jun. 10, 2005) ("[T]his Court sees no reason why the parents' choice of program should not be evaluated under the same standards, looking at the program at the time that the parents selected it and determining whether, at that point, it was a program reasonably calculated to provide the child with an educational benefit.").

The Court declines, however, to expand the record to include a report prepared in January 2008 by Rivka Weltscher, a special education teacher hired by N.G.'s parents to observe him in his B'nai Yoel classroom, that the plaintiffs now seek to offer in evidence. *See* Report of R. Weltscher. Pls.' Ex. A, ECF No. 9–1. Not only has Kiryas Joel had no opportunity to challenge Weltscher's unsworn statements, but also her observations are irrelevant, having been made a full year and a half after the end of the 2005–06 school year at issue here and roughly nine months after the impartial hearing came to an end. *See Trumbull*, 414 F.Supp.2d at 171 (holding that, irrespective of the validity of retrospective evidence generally, evidence pertaining to an entirely different school year than the one at issue is "of questionable relevance").

disabilities" a "free appropriate public education."[27] *See* 20 U.S.C. § 1412(a)(1)(A). To meet the statutory standard, a school district must provide each student with a disability with "special education and related services" designed to meet the student's individual needs. *Id.* § 1401(9). These services must be administered in accordance with an IEP, which is crafted and revised each year by the district, the child's parents, and other education specialists, who collectively constitute the IEP team, or, under New York law, the CSE. *Id.* § 1414(d)(1)(B); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(2011).

■■ An IEP is intended to be "a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs." *School Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 368, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985); *see* 20 U.S.C. § 1414(d)(1)(A)(i). The IEP must reflect the child's academic achievement, functional performance, and social, behavioral, and physical development at that time. *Walczak*, 142 F.3d at 122–23 (citing N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(kk)(2)(i) (1997)); *see* 20 U.S.C. § 1414(d)(3)(A)(iv). Given the IDEA'S strong preference for parental participation, the IEP must also incorporate "the concerns of the parents for enhancing the education of their child," although their final consent is not required. 20 U.S.C. § 1414(d)(3)(A)(ii); *see Burlington*, 471 U.S. at 368, 105 S.Ct. 1996 (noting the IDEA'S emphasis on "the participation of the parents in developing the child's educational program and assessing its effectiveness."). To the extent, if any, that the CSE does not recommend that the child receive a regular education alongside children without disabilities, this too must be explained in the IEP. 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

■ A district offers a student a free appropriate public education when (1) the child's IEP is developed in compliance with the procedural requirements of the IDEA, and (2) the IEP is "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034; *see Burlington*, 471 U.S. at 370, 105 S.Ct. 1996. As to the first part of this two-step inquiry, compliance by a school district with the significant procedural provisions of the IDEA "is no mere formality." *Walczak*, 142 F.3d at 129. It will "in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Grim*, 346 F.3d at 381 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034). Not every procedural error in the development of an IEP, however, renders it inadequate under the IDEA. *Id.* Rather, a procedural flaw necessitates a finding that a child was denied his or her right to a free appropriate public education only if it results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in formulating the IEP. 20 U.S.C. § 1415(f)(3)(E)(ii); *see Matrejek v. Brewster Cent. Sch. Dist.*, 471 F.Supp.2d 415, 419 (S.D.N.Y.2007) (noting that procedural inadequacies must "cause substantive harm to the child or his parents" for relief to be granted); *A.E. ex rel. Mr. & Mrs. E.*

---

**27.** "The term 'free appropriate public education' means special education and related services that—

 (A) have been provided at public expense, under public supervision and direction, and without charge;

 (B) meet the standards of the State educational agency;

 (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

 (D) are provided in conformity with the individualized education program required under section 1414(d) of this title."

20 U.S.C. § 1401(9).

*v. Westport Bd. of Educ.,* 463 F.Supp.2d 208, 216 (D.Conn.2006).

 Under the second and "substantive" prong of *Rowley,* the IDEA does not mandate "any specific level of educational benefits that must be provided through an IEP." *Walczak,* 142 F.3d at 130. A district is not required to "maximize" each child's educational capacity, but "the door of public education must be opened in a 'meaningful way,' and the IEP must provide the opportunity for more than only 'trivial advancement.'" *Newington,* 546 F.3d at 119 (quoting *Walczak,* 142 F.3d at 130) (other internal quotation marks omitted); *see Rowley,* 458 U.S. at 199, 102 S.Ct. 3034 (holding that districts are not required to "furnish[] ... every special service necessary to maximize each handicapped child's potential"). A school district "satisfies this requirement by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley,* 458 U.S. at 203, 102 S.Ct. 3034. The education provided need only be "appropriate," "not one that provides everything that might be thought desirable by loving parents." *Walczak,* 142 F.3d at 132 (quoting *Tucker v. Bay Shore Union Free Sch. Dist.,* 873 F.2d 563, 567 (2d Cir.1989)); *see Watson ex rel. Watson v. Kingston City Sch. Dist.,* 325 F.Supp.2d 141, 144 (N.D.N.Y.2004) ("While the IDEA requires districts to provide appropriate education to disabled students, this is not necessarily synonymous with offering disabled students the best educational opportunities available.").

 Although the IDEA does not require school districts to "maximize the potential of handicapped children commensurate with the opportunity provided nonhandicapped children," *Rowley,* 458 U.S. at 200, 102 S.Ct. 3034, the concept of maximization does apply insofar as that "[t]o the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The IDEA'S requirement that a child be educated in the "least restrictive setting consistent with [her] needs" represents "a strong preference for 'mainstreaming.'" *Grim,* 346 F.3d at 379 (quoting *Walczak,* 142 F.3d at 122). Courts therefore "should consider, first 'whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child,' and, if not, then 'whether the school has mainstreamed the child to the maximum extent appropriate.'"[28] *Newington,* 546 F.3d at 120 (quoting *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1048 (5th Cir.1989)).

 The Second Circuit has held that, in applying the first part of this two-part mainstreaming test, district courts should look to the factors outlined in *Oberti,* 995 F.2d at 1217–18, which include, but are not limited to, "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of

---

**28.** "Education in the regular classroom, in this context, means placement in a regular class for a significant portion of the school day." *Oberti v. Clementon Sch. Dist.,* 995 F.2d 1204, 1215 n. 21 (3d Cir.1993).

the child on the education of the other students in the class." *Newington*, 546 F.3d at 120. "If the school has given no serious consideration to including the child in a regular class with such supplementary aids and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." *Oberti*, 995 F.2d at 1216. In contrast, if "an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it" suggests the district was justified in placing the child in a special-education classroom, then the court must consider the second part of the mainstreaming test. *Newington*, 546 F.3d at 120. In this regard, courts should evaluate whether the child has been included in school programs—including non-academic components of the school day like lunch and recess—alongside children without disabilities to the maximum extent appropriate. *See id.* A court's review, while deferential to the state authorities charged with designing and implementing educational policy, "must be searching" to ensure that the IDEA'S maximizing goal of mainstreaming a child with disabilities, where appropriate, is met. *Id.* at 120–21.

■■■■ Only if a child's disability is so severe that a regular education, even when supplemented by supports and services, will not produce satisfactory results may the child be educated in a special education classroom, home, hospital, institution, or other segregated setting. *Walczak*, 142 F.3d at 122; 20 U.S.C. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.115 (each school district "must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services"). " '[E]ven in cases in which mainstreaming is not a feasible alternative,' the statutory preference for a least restrictive placement applies," *Walczak*, 142 F.3d at 132 (quoting

*Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir.1992) (holding that an extended day program was the least restrictive environment for a child unable to be in a mainstream setting, even though she might have benefitted more from a residential placement)). Moreover, "a determination that a child with disabilities might make greater *academic* progress in a segregated, special education class may not warrant excluding that child from a regular classroom environment." *Oberti*, 995 F.2d at 1217 (emphasis in original). On the other hand, "it is not enough to show that a student is obtaining *some* benefit, no matter how minimal, at the mainstream school in order to prove" that a regular education setting constitutes the student's least restrictive environment. *Board of Educ. of Tp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 277 (7th Cir. 2007) (emphasis in original). "Under the Act, where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate." *Briggs v. Board of Educ.*, 882 F.2d 688, 692 (2d Cir.1989).

■■■■ Where a school district fails to offer a free appropriate public education on either procedural or substantive grounds, the child's parents may send him to a private program and seek retroactive reimbursement from the state. *Cerra*, 427 F.3d at 192. Parents who unilaterally withdraw their child from public school and subsequently seek reimbursement for privately obtained services, however, "do so at their own financial risk." *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993), Parents challenging an IEP are entitled to reimbursement for the private placement only if a federal court determines that: (1) the proposed IEP was procedurally or substantively inade-

quate; (2) the private placement obtained by the parents is appropriate for the child's needs; and (3) the equities support the parents' claim. *Cerra,* 427 F.3d at 192; *see Burlington,* 471 U.S. at 374, 105 S.Ct. 1996. "[B]ecause the authority to grant reimbursement is discretionary, 'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" *Frank G.,* 459 F.3d at 363–64 (quoting *Burlington,* 471 U.S. at 374, 105 S.Ct. 1996).

■■■■ The burden of proof in IDEA actions falls upon the party seeking relief.[29] *Schaffer ex rel. Schaffer v. Weast,* 546 U.S. 49, 57–58, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). Therefore, parents seeking reimbursement for a private placement must demonstrate the appropriateness of that placement, even if the district failed to offer the child a free appropriate public education. *Frank G.,* 459 F.3d at 364. But while it must be appropriate, a "private placement need not meet state education standards or requirements." *Id.* (citing *Carter,* 510 U.S. at 14, 114 S.Ct. 361). "The test for parents' private placement is not perfection." *M.S. ex rel. S.S. v. Board of Educ.,* 231 F.3d 96, 105 (2d Cir.2000), *abrogated on other grounds by Schaffer,* 546 U.S. at 57–58, 126 S.Ct. 528. At the same time, appropriateness of the private program, much like its public counterpart, depends on whether the child reasonably can expect to derive educational benefit from the placement—that is,

whether it is "likely to produce progress, not regression." *Gagliardo,* 489 F.3d at 112. "Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances." *Frank G.,* 459 F.3d at 365. "A unilateral private placement is only appropriate if it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child.'" *Gagliardo,* 489 F.3d at 115 (quoting *Rowley,* 458 U.S. at 188–89, 102 S.Ct. 3034) (emphasis in original).

Parents may challenge the sufficiency of a proposed IEP and seek reimbursement for a private placement by requesting an "impartial due process hearing" before an IHO appointed by the local board of education. *See* 20 U.S.C. § 1415(f); N.Y. Educ. L. § 4404(1). The IHO's decision may be appealed to an SRO of the OSR. *See* 20 U.S.C. § 1415(g); N.Y. Educ. L. § 4404(2). So long as this state administrative procedure properly is exhausted, a party may challenge the SRO's decision either in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

■■■■ The pendency of IDEA proceedings also triggers what is referred to as the statute's stay-put provision, which provides that "during the pendency of any proceedings conducted pursuant to this section, unless the state or local educational agency and the parents otherwise agree,

---

**29.** Effective October 14, 2007, New York State amended its Education Law to shift the burden of proof back to the school district in an impartial hearing, except that parents bear the burden of establishing that an unilateral private placement was appropriate when they seek tuition reimbursement for it. *See* N.Y. Educ. Law § 4404(1)(c) (McKinney 2001 & 2008 Cumulative Pocket Part), as amended by N.Y. Laws 2007, c. 583, § 2 (prospective application only); *see also L.K. v. Department of Educ.,* No. 09–CV–2266, 2011 WL 127063, at

*4 (E.D.N.Y. Jan. 13, 2011). Because the impartial hearing in this case was concluded prior to October 14, 2007, the burden of proof both as to the inappropriateness of the IEP and the appropriateness of the private placement squarely rests with N.G.'s parents under *Schaffer. See Gagliardo,* 489 F.3d at 112 (holding that, under *Schaffer,* the party that initiates the impartial hearing bears the burden of persuasion on both *Rowley/Burlington* factors).

the child shall remain in the then-current educational placement of such child." 20 U.S.C. § 1415(j); *see* 34 C.F.R. § 300.518(a) (2007); N.Y. Educ. L. § 4404(4)(a)(2010). A student's "then-current placement" has been interpreted to mean: "(1) 'typically the placement described in the child's most recently implemented IEP;' (2) 'the operative placement actually functioning at the time ... when the stay put provision of the IDEA was invoked;' and (3) '[the placement at the time of] the previously implemented IEP.'" *Mackey v. Board of Educ.,* 386 F.3d 158, 163 (2d Cir.2004) (internal citations omitted). Because the stay-put provision seeks to maintain the status quo, the school district must "continue to finance" the student's educational placement to avoid a break or discontinuation in services. *Id.* (quoting *Zvi D. v. Ambach,* 694 F.2d 904, 906 (2d Cir.1982)); *see Schaffer,* 546 U.S. at 65 n. 1, 126 S.Ct. 528 (Ginsburg, J., dissenting). Whether the district has failed to provide a child's pendency entitlements is "evaluated independently" from the parents' claim as to the inadequacy of the IEP, *Mackey,* 386 F.3d at 162, "because pendency placement and appropriate placement are separate and distinct concepts," *Board of Educ. v. O'Shea,* 353 F.Supp.2d 449, 459 (S.D.N.Y.2005). The stay-put provision of the IDEA "represents 'Congress' policy choice that all handicapped children, *regardless of wheth-er their case is meritorious or not,* are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved.'" *Mackey,* 386 F.3d at 160–61 (quoting *Susquenita Sch. Dist. v. Raelee S.,* 96 F.3d 78, 83 (3d Cir.1996)); *see Brennan v. Regional Sch. Dist. No. 1 Bd. of Educ.,* 531 F.Supp.2d 245, 265 (D.Conn.2008) (stating that, where stay-put provision requires a child to be placed in a private setting, the parents are entitled to reimbursement, even if they are unsuccessful in arguing that their child was denied a free appropriate public education).

## C. Pendency Entitlements

■ Separate and apart from their claim that N.G. was denied his right to a free appropriate public education, R.G. and J.G. seek compensatory education for the delay he experienced in his related therapy sessions under 20 U.S.C. § 1415(j).[30] The IHO concluded that Kiryas Joel's written offers to provide these services did not suffice to maintain N.G.'s then-current educational placement, and she ordered that the family be reimbursed for privately obtained therapies during the lapse.[31] IHO Decision 124–25. The SRO annulled the reimbursement award, on the ground that "the delay in providing related services for the student was due to the [parents'] failure to adequately respond to [Kiryas Joel]'s offers of services." SRO Decision

---

**30.** "Compensatory education is 'prospective equitable relief' that requires a school district to fund education 'as a remedy for any earlier deprivations in the child's education.'" *Student X. v. New York City Dep't of Educ.,* No. 07–CV–2316, 2008 WL 4890440, at *24 (E.D.N.Y. Oct. 30, 2008) (quoting *Somoza v. New York City Dep't of Educ.,* 538 F.3d 106, 109 n. 2 (2d Cir.2008)).

**31.** Although N.G.'s parents sought compensatory education, the IHO awarded monetary reimbursement. While this discrepancy is not explained in her decision, the IHO may have believed "imposing liability for compensatory educational services on [Kiryas Joel] 'merely require[d] [the district] to belatedly pay expenses that [it] should have paid all along.'" *Mr. A. ex rel. D.A. v. New York City Dep't of Educ.,* No. 09 Civ. 5097, 769 F.Supp.2d 403, 426, 2011 WL 321137, at *20 (S.D.N.Y. Feb. 1, 2011) (quoting *Burlington,* 471 U.S. at 370–71, 105 S.Ct. 1996); *see Brown v. Bartholomew Consol. Sch. Corp.,* 442 F.3d 588, 597 (7th Cir.2006) (defining compensatory education as "relief in the form of reimbursement for out-of-pocket educational expenses").

14. By "not sufficiently cooperat[ing]," the SRO reasoned that R.G. and J.G. effectively forfeited N.G.'s entitlement to pendency services. *Id.*

R.G. and J.G. triggered N.G.'s pendency entitlements when they filed the due process demand notice on October 6, 2005; N.G. did not move into Kiryas Joel Village, however, until November 10, 2005. On November 1, 2005, in a letter to N.G.'s parents, Kiryas Joel first expressed its intent to provide pendency services, but it was not until nearly a month later that R.G. and J.G. responded, also by letter. That same day the district again wrote to them, asking that they contact Bernardo by telephone to schedule the provision of services. Again, N.G.'s parents waited over three weeks to reply with another letter, and the following day, December 23, Kiryas Joel once more requested in writing that the parents call Bernardo. On January 5, 2006, Gartenberg called R.G. to arrange the schedule, and R.G. responded by letter three days later, asking that the schedule be sent by facsimile to her. It appears that Kiryas Joel complied with this request either that same day or the next day because, on January 9, R.G. sent a letter accepting some of the therapy sessions and inquiring whether others could be held at different times. N.G. began his first district-provided therapy session on January 17. Therefore, this Court finds that N.G.'s pendency entitlements were not provided from November 10, 2005 (when N.G. moved into the village) to January 17, 2006 (when he began receiving his related therapies).[32] Neither party contests, and this Court does not disturb, the IHO's finding that the services to which he was entitled were those recommended by East Ramapo's CPSE in the 2005 Extended Year IEP, as his last agreed-on educational placement.[33] *See* IHO Decision 124.

 While compensatory education may be an appropriate and available remedy for a violation of 20 U.S.C. § 1415(j), *cf. Newington,* 546 F.3d at 123, the Supreme Court has emphasized that IDEA relief depends on "equitable considerations," *Carter,* 510 U.S. at 15–16, 114 S.Ct. 361. "As with any entitlement that arises in equity ... if the evidence demonstrates that the parents caused or contributed to the delay, a court could find that they are wholly or partly disentitled to pendency reimbursement." *Arlington Cent. Sch. Dist. v. L.P.,* 421 F.Supp.2d 692, 701 (S.D.N.Y.2006). Here, Kiryas Joel's replies to N.G.'s parents' requests for pendency services were consistently prompt and professional, yet were just as consistently met with inaction by the family. While the purpose of the stay-put provision is to maintain the status quo, R.G. and J.G. failed to exercise the appropriate degree of urgency and responsiveness necessary to ensure that their son did not experience a gap in services. *Cf. Mr. "M" ex rel. "K.M." v. Ridgefield Bd. of Educ.,* No. 3:05–CV–584, 2007 WL 987483, at *7 (D.Conn. Mar. 30, 2007) (finding in favor of the school district where "the parents' own choices [to delay certain tests and evaluations of the child] were intertwined with

---

32. The IHO found that the district met its obligation to provide pendency services when Gartenberg "contacted [R.G.] directly with a proposed schedule of services" on January 5, 2006. IHO Decision 124. Although it is not outcome–determinative, this Court instead considers January 17, 2006, the day that N.G.'s therapy began, to be the day that the

district complied with the mandate of 20 U.S.C. § 1415(j).

33. The 2005 Extended Year IEP prepared by East Ramapo's CPSE was the basis for the 2005–06 School Year IEP prepared by Kiryas Joel's CSE, and yet, as discussed, N.G.'s parents accepted the former but rejected the latter.

the Board's decisions in such a way as to break the chain of causation between the Board's actions and any prejudice to K.M.'s education"); *but see Penn Trafford Sch. Dist. v. C.F. ex rel. M.F.*, No. Civ. A. 04–1395, 2006 WL 840334, at *6 (W.D.Pa. Mar. 28, 2006) ("[T]he right to compensatory education belongs to the disabled child and should not be deprived based upon the parents' inaction,"). This Court is sympathetic to the fact that "parents of children requiring special educational provisions are not always fully aware of the complicated nature and legal demands of ushering a child through such services, including all relevant arcane bureaucratic impositions." *R.C. v. Carmel Cent. Sch. Dist.*, No. 06 Civ. 5495, 2007 WL 1732429, at *5 (S.D.N.Y. Jun. 14, 2007). But, here, from at least the time they filed their due process demand notice, N.G.'s parents were represented by counsel who ought have explained to them the potential legal ramifications of their delayed acceptance of district-provided therapy sessions. Giving due weight to the final conclusion of the state authorities that R.G. and J.G. "fail[ed] to adequately respond to [Kiryas Joel's] offer of services," SRO Decision 14, the Court declines to compensate N.G.'s parents for the lapse in N.G.'s pendency entitlements.

### D. Procedural Compliance

As to the validity of Kiryas Joel's 2005–06 School Year IEP, R.G. and J.G. allege that it did not offer N.G. a free appropriate public education due to several procedural violations: (1) a regular education teacher was not present at the CSE's IEP meeting; (2) a special education teacher was not present at the meeting; (3) N.G.'s parents did not waive their right to have a "parent member" present at the meeting; (4) an assistive technology evaluation was not undertaken; and (5) the district "predetermined" N.G.'s placement in its special education classroom.

### 1. Statutory Requirement that a Regular Education Teacher Be Present at the IEP Meeting

██ The IDEA requires that a regular education teacher be present at the formation of a child's IEP "if the child is, or may be, participating in the regular education environment." 20 U.S.C. § 1414(d)(1)(B)(ii); *see* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(ii)(2011). The statute's plain language makes clear that the presence of a regular education teacher is conditional: either the child currently must be placed in a mainstream setting or the child's educational background and history must indicate that mainstreaming ought be explored in the future. If the child's placement does not, and is not likely to, involve a regular education classroom, then the CSE need not include a regular education teacher. Even if the absence of a regular education teacher is deemed to have contravened the IDEA, the IEP itself is not rendered a "nullity," unless the absence "impeded the child's right to a free appropriate public education," "significantly impeded" the parents' "opportunity to participate in the decision making process," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

██ Here, the record reflects, and the parties do not dispute, that a regular education teacher was not in attendance at the August 18, 2005 meeting of Kiryas Joel's CSE to develop N.G.'s IEP. Kiryas Joel contends that, because N.G. was enrolled in a special education program immediately prior to moving into the district and because his evaluations from that program universally recommended that he continue in a self-contained, special education classroom, its CSE was properly constituted without a regular education teacher. The referral form prepared when N.G.'s family first contacted the CSE did not indicate

that either his mother or his service coordinator had expressed an interest in a mainstream placement, suggesting that the district, in its preparations for the IEP meeting, lacked notice of R.G. and J.G.'s desire to have N.G. be educated alongside typically developing peers. As the IHO found, there is no other evidence in the record indicating an awareness on the part of Kiryas Joel prior to convening the meeting. IHO Decision 112. Only at the meeting did N.G.'s parents inform the CSE that he already was being "mainstreamed" by participating in B'nai Yoel's Sunday class and that they wished for him to continue there full-time. The CSE then discussed this possibility before ultimately rejecting it. Kiryas Joel's CSE was well-versed in mainstreaming, as roughly half of its students spend a portion of their school day in a yeshiva, and Gartenberg, in particular, brought her knowledge of, experience with, and certification in regular education to bear on the IEP that the CSE proposed for N.G. Moreover, in an effort to reach a compromise solution, the CSE offered to have N.G. attend Kiryas Joel on a trial basis, to observe him in that environment as well as in his classroom at B'nai Yoel, and then to reconvene to discuss options going forward. R.G. and J.G. did not accept this proposal.

On the basis of these facts, both the IHO and the SRO concluded that a regular education teacher was not required at N.G.'s IEP meeting, and this Court gives their conclusion its due weight.[34] Because

the statutory requirement that a regular education teacher attend an IEP meeting applies only if the child is, or may be, in a mainstream environment, and because here there was no reason for Kiryas Joel to believe that such an environment would be appropriate for N.G., and the CSE was not informed in advance of the meeting of his parents' intention to enroll him at B'nai Yoel, this Court concludes that no procedural violation occurred.

■ Moreover, even if the presence of a regular education teacher at the IEP meeting was required, such a teacher's absence did not deny N.G. his entitlement to a free appropriate public education. Contrary to what N.G.'s parents suggest, the presence of a regular education teacher would not have guaranteed their child a mainstream placement. Rather, the greatest educational benefit that N.G. could have derived from the presence of a regular education teacher would have been consideration by the CSE of the appropriateness of mainstreaming him in the yeshiva. *See Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 860 (6th Cir.2004) ("The rationale for requiring the attendance of a regular education teacher is closely tied to Congress's 'least restrictive environment' mandate. The input provided by a regular education teacher is vitally important in considering the extent to which a disabled student may be integrated into a regular education classroom and how the student's individual needs might

---

**34.** Nonetheless, this Court is troubled by the inference reasonably drawn from the record that Kiryas Joel's CSE, in fact, never includes a regular education teacher in its IEP meetings. if a child for whom mainstreaming clearly is appropriate is enrolled dually at a local yeshiva, then his or her teachers there would be invited to participate in the CSE's development of the IEP, but their attendance is not, and cannot be, guaranteed. Moreover, while placement at a yeshiva is effectively the only mainstream option in Kiryas Joel Vil-

lage, given the community's religiosity, it is not a regular education that meets the criteria of the New York State Education Department. Tr. 7266–67. The staff of the local yeshivas generally have not obtained schooling beyond the equivalent of a high school diploma; few, if any, are state-certified educators. Thus, even if a teacher of the yeshiva were to attend a child's IEP meeting, the requirement of that a regular education teacher be present would not necessarily be satisfied.

be met within that classroom."); *see also M.L. v. Federal Way Sch. Dist.*, 394 F.3d 634, 649 (9th Cir.2005) ("[A]ny regular education teacher would have contributed his or her knowledge of the ability of a disabled student to benefit from being placed in a regular classroom."). Even without a teacher signed into the meeting as a regular educator, this is precisely what he received. The CSE fully deliberated his parents' request that he attend B'nai Yoel, once that desire was made known to them. Their discussion was well served, in particular, by Gartenberg's background in regular education as well as her extensive experience with mainstreaming other students of Kiryas Joel. Furthermore, there is no evidence that, by failing to present a regular education teacher at the IEP meeting, Kiryas Joel impeded N.G.'s parents' opportunity to participate in the decision making process. The record supports a finding that N.G.'s parents were very involved in the process, and while they were dissatisfied with the outcome, ultimately the IDEA does not require parents to approve a CSE's proposed IEP, Thus, even if a procedural violation occurred, which this Court rules that it did not, it was not an error sufficient to render the CSE's proposed IEP inadequate.

### 2. Statutory Requirement that a Special Education Teacher Be Present at the IEP Meeting

The IDEA mandates the presence at an IEP meeting of a special education teacher or a special education provider of the child whose IEP is being developed. 20 U.S.C. § 1414(d)(1)(B)(iii). Where a CSE is constituted without a special education teacher, the inquiry is, again, whether this procedural error led to the child being denied an educational opportunity or to the child's parents being denied their right to participate in the IEP formation. 20 U.S.C. § 1415(f)(3)(E)(ii). Here, the parties agree that none of the CSE members was

present in his or her capacity as a special education teacher or as a provider of special education services to N.G. As the IHO and SRO held, the absence of a special education teacher or provider was a procedural violation of the IDEA.

Nonetheless, as the state authorities also concluded, this violation did not result in N.G. being denied a free appropriate public education. Several of the CSE members had extensive backgrounds and relevant certifications in special education, whether as teachers, administrators, therapists, or psychologists. IHO Decision 115. As the IHO correctly stated, "[e]ach of these individuals participated significantly in the development of [N.G.]'s IEP, and many of [N.G.]'s global delays lie primarily within these individuals' areas of expertise." *Id.* Given that the district exclusively offers special education, its CSE members were arguably the most qualified group of educators available to assess N.G.'s special needs and to provide specific guidance as to his ability to function and excel in the self-contained classroom that they recommended. Certainly, it is to ensure that such specialized knowledge is incorporated into a child's IEP that the IDEA mandates the presence of a special education teacher or provider. *Cf. A.H. ex rel. J.H. v. Department of Educ. of City of N.Y.*, 394 Fed.Appx. 718, 720 (2d Cir.2010) (no procedural violation where the special education teacher who participated in formulating a child's IEP had never taught the child because "nothing in the record indicates that this teacher in any way lacked knowledge regarding the special education program options for the student" (internal quotation marks omitted)). N.G.'s parents have identified no harm that they or their son suffered due to the absence of a special education teacher or provider at the IEP meeting. While the CSE failed to comply with the statuto-

ry requirement in convening without a specially designated special education instructor, and while such disregard for an act of Congress is not condoned by this Court, the parents have not proved that this shortcoming on the part of Kiryas Joel obstructed N.G.'s right to a free appropriate public education, limited their opportunity to participate in the decision making process, or deprived N.G. of any educational benefit.

### 3. Waiver of the Presence of a "Parent Member" at the IEP Meeting

██ It is within "the discretion of the parent or the agency" whether "other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate," are present at the IEP meeting. 20 U.S.C. § 1414(d)(1)(B)(vi). "The IDEA does not require the presence of a parent member and the parent member's absence cannot, therefore, be considered a procedural defect under the federal statute." *Board of Educ. v. Mills*, No. 03 Civ. 0050, 2005 WL 1618765, at *5 (S.D.N.Y. Jul. 11, 2005); *see R.R. ex rel. M.R. v. Scarsdale Union Free Sch. Dist.*, 615 F.Supp.2d 283, 293 (S.D.N.Y.2009). New York State law gives parents the opportunity to waive a parent member's participation at the IEP meeting. N.Y. Educ. Law § 4402(1)(b)(1)(a) (McKinney 2001); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(viii) (2011).

██ Here, at the IEP meeting on August 18, 2005, Kiryas Joel presented R.G. with a form on which she could elect to waive the presence of a parent member, and she did so. While her testimony indicated that she felt unspoken pressure to waive her right to the presence of parent member because Kiryas Joel's CSE generally proceeded without one for confidentiality reasons, R.G. stated that she was given a choice, that she did not inform

anyone that she wanted a parent member, and she understood she was agreeing to waive her right. *See Mills*, 2005 WL 1618765, at *2, *5 (although parent felt "awkward" when told that IEP meeting would have to be postponed if she requested presence of parent member, she knowingly and effectively waived her right with handwritten note that she was "willing to continue without [parent member's] presence"). The IHO concluded that R.G. was not forced to sign this waiver, and this Court does not second-guess this judgment as to the credibility of R.G.'s testimony. *Id.* at *5 (suggesting issue of waiver of parent member is one of credibility, not statutory construction).

### 4. Assistive Technology Evaluation

The IDEA requires that a CSE in developing a student's IEP "consider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v). An assistive technology device is "any item, piece of equipment, or product system … that is used to increase, maintain, or improve the functional capabilities of a child with a disability." *Id.* § 1401(1)(A). An assistive technology service is "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device," which includes "the evaluation of the needs of such child." *Id.* § 1401(2)(A).

The IHO concluded that an assistive technology evaluation was appropriate for N.G., given his tremendous speech and language deficits and contradictory testimony about his use of PECS. IHO Decision 118–20. Because various CSE members indicated that no such evaluation was completed, the IHO ordered one at Kiryas Joel's expense. *Id.* at 120–21. In contrast, the SRO found that none of the information before the CSE on August 18, 2005 suggested a need for an assistive

technology evaluation. SRO Decision 18. The SRO focused mainly on the fact that N.G.'s use of PECS was at a "very, very basic" level or "preliminary stage" and that his pointing to pictures was developmentally appropriate. *Id.* He also noted that the speech and language therapy recommended by the CSE for N.G. "use[d] assistive technology devices and services that [were] provided without a specific designation on [N.G.]'s IEF," and that Kiryas Joel had the resources to offer "myriad" assistive technology devices to its students. *Id.* While the SRO therefore concluded that the IHO erred in ordering an assistive technology evaluation for N.G., the SRO recognized that, in January 2006, N.G. began working with a district-provided speech and language therapist, who used PECS (although his parents did not think it beneficial), and that, at the end of the 2005–06 school year, this therapist recommended developing an augmentative communication system for N.G. *Id.* at 18–19. Citing "the passage of time since the August 2005 CSE meeting and the disconnect between [R.G. and J.G.] and [Kiryas Joel] regarding which type of augmentative communication system is appropriate for the student," the SRO modified the IHO's order that an assistive technology evaluation be undertaken "if one has not already been conducted." *Id.* at 19.

Because the time between the IEP meeting and the present day is now even greater, and because the testimony was conflicting regarding the extent to which N.G. was utilizing and benefitting from PECS, this Court holds, without further deliberation, that the equities support the SRO's order that an assistive technology evaluation be completed if N.G. has not already been subject to one.

**5. Alleged Predetermination by Kiryas Joel's CSE of N.G.'s IEP**

 Predetermination by a CSE of a child's IEP "amounts 'to a procedural violation of the IDEA.'" *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir.2006) (quoting *Deal*, 392 F.3d at 857). It can rise to the level of a substantive harm, and therefore deprive a child of a free appropriate public education, where the child's parents are "effectively deprived" of "meaningful participation in the IEP process." *Id.* (quoting *Deal*, 392 F.3d at 857). The "core of the statute" is that the development of the IEP be a "cooperative process" between the parents and the district, *Schaffer*, 546 U.S. at 53, 126 S.Ct. 528, and predetermination by a district of a child's IEP undermines the IDEA'S fundamental goal to give parents a voice in the educational upbringing of their children. *See Nack*, 454 F.3d at 610; *see also J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 447 (9th Cir.2010) ("Parental participation in the development of an IEP is the cornerstone of the IDEA." (citing *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007))).

 Courts have rejected predetermination claims where the parents actively and meaningfully participated in the development of the IEP, *M.M. ex rel. A.M. v. New York City Dep't of Educ. Region 9 (Dist. 2)*, 583 F.Supp.2d 498, 506–07 (S.D.N.Y.2008); *N.L. ex rel. Ms. C v. Knox Cty. Schs.*, 315 F.3d 688 (6th Cir.2003); *Fuhrmann ex rel. Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir.1993), or where there was credible evidence that the school district was open-minded at the IEP meeting, *Hanson ex rel. Hanson v. Smith*, 212 F.Supp.2d 474, 486 (D.Md.2002); *Doyle v. Arlington Cty. Sch. Bd.*, 806 F.Supp. 1253, 1261–62 (E.D.Va.1992). A school district's CSE may review evaluations, consider recommendations, and form opinions as to a child's placement in advance of the IEP

meeting, so long as it remains opens to changes. *See Deal,* 392 F.3d at 857–58. The Second Circuit has held that preparatory activities that fall short of a pre-meeting agreement are not synonymous with predetermination. *Mamaroneck,* 554 F.3d at 253. Those courts that have found predetermination have relied on evidence that the school district had an unofficial policy of refusing certain support programs. *Deal,* 392 F.3d 840, independently proposed an IEP placing the child in a preexisting program, *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23,* 960 F.2d 1479, 1484 (9th Cir.1992), *superseded by statute on other grounds by* Individuals with Disabilities Education Act Amendments of 1997, Pub. L. 105–17, § 614(d)(1)(B), 111 Stat. 37, *as recognized in L.M. v. Capistrano Unified Sch. Dist.,* 556 F.3d 900, 909 (9th Cir.2009), or wrote letters stating its intent to change a student's placement before developing an IEP, *Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Schs.,* 853 F.2d 256, 257, 259 (4th Cir.1988).

■ Here, N.G.'s parents argue that the fact that Kiryas Joel did not offer a regular education option and recommended placement in its special education classroom—this being its only in-district offering—indicates that N.G.'s IEP was predetermined. Alleging that Kiryas Joel "failed to come to N.G.'s IEP meeting with an open mind," they view the district as "woodenly" having offered N.G. a "cookie-cutter" or " 'default' placement, i.e., a self-contained, special education classroom with no opportunities for inclusion." Pls.' Mem. Supp. Mot. Summ. J. 12, 24, ECF No. 9. They assert that this recommendation was not sufficiently individualized and that it denied them the opportunity to meaningfully participate in the process of crafting an appropriate plan for their son.

While this Court ultimately concludes that the district failed to offer N.G. his least restrictive educational setting, *see infra* at 655, the record does not support a finding that Kiryas Joel went so far as to improperly predetermine N.G.'s IEP. Kiryas Joel's officials, specifically its principal and CSE's chairperson, both testified to the district's willingness to support its children in regular education environments, if appropriate. While at this time no child with disabilities residing in Kiryas Joel attends another public school under such an arrangement, this is due not to a failure of the district to provide mainstreaming opportunities to its eligible students but rather due to the unique circumstances of this vigorously religious community, which chooses to send its children to the local yeshivas. To the dozens of students with disabilities who spend some part of their school day at one of the yeshivas, being educated alongside typically developing peers, Kiryas Joel provides related services. It even operates a resources room at one of the yeshivas, which allows students whose disabilities are less severe to receive services there instead of traveling between Kiryas Joel and the religious school. To find that Kiryas Joel predetermined N.G.'s placement in its special education classroom simply because that is its only on-site program would be to ignore the persuasive, established, and contrary fact that the district already accommodates so many of its students whose parents seek placement in a less restrictive environment.

It also would ignore the evidence, in the form of testimony by Salzberg and Gartenberg, that Kiryas Joel's CSE prioritizes developing an IEP in conjunction with the child's parents, so as to devise a plan workable for everyone involved. Salzberg emphasized that in IEP meetings he pushes parents to explain why mainstreaming is appropriate for their child, just as he asks school district personnel to reevaluate a child's placement whenever

the child has demonstrated progress over the course of the school year. At the same time, he testified that ultimately Kiryas Joel is required to develop what it believes is an appropriate IEP for each child, which may or may not include mainstreaming, even where that recommendation conflicts with the parents' wishes. There is no evidence in this record from which the Court can infer that the district failed to approach the IEP meeting with an open mind or sought to preclude the participation of N.G.'s parents. Rather, the record suggests that Kiryas Joel was willing to consider, and in fact did consider, the parents' request for a mainstream placement for N.G.; however, the district believed such a placement was inappropriate in light of N.G.'s significant global delays. Because R.G. and J.G. have failed to prove predetermination, this Court holds, as the SRO did, that no such procedural violation occurred.

### E. Substantive Compliance

First, R.G. and J.G. argue that the IEP was substantively invalid in that it was not reasonably calculated to enable N.G. to derive educational benefits. Second, they vehemently contest the CSE's determination that a special education classroom with related services was N.G.'s least restrictive environment.

### 1. Reasonably Calculated to Provide Educational Benefits

■ R.G. and J.G. contend that substantively the IEP devised by Kiryas Joel for N.G. for the 2005–06 school year was not reasonably calculated to provide N.G. with educational benefits. But, here, Kiryas Joel offered N.G. an IEP that was virtually identical to his IEP developed four months earlier by East Ramapo's CPSE. Both districts' IEPs directly reflected the comprehensive educational and therapy evaluations of N.G. that had been completed in March and April 2005—and that, most importantly, R.G. confirmed were accurate in describing her son at the time that Kiryas Joel's CSE met to formulate his IEP for the upcoming year. Those evaluations, while recognizing the positive developments that N.G. had attained over the course of the 2004–05 school year, were unequivocal and strong in their recommendation that special education and related services be continued for N.G. Two of the evaluations used words like "consistency," "intensity," "carry-over," and "follow-through" in explaining N.G.'s need for an ongoing and highly structured program. Tellingly, one of the evaluators indicated that N.G. lacked some of the fundamental "prerequisites like reading—necessary for transitioning into Kindergarten."

Relying on these evaluations, as well as past medical records and an updated social history, it was not unreasonable for Kiryas Joel's CSE to propose an IEP virtually identical to his previous one. In fact, the district would have been hard-pressed to justify a dramatic shift toward mainstreaming in light of the depiction of N.G. as a child with severe disabilities who fell within the first percentile for his age group in critical areas like speech and language. Moreover, the consistency of the evaluations in acknowledging that N.G. had made some progress, however modest, by following his previous IEP of strictly special education and related services supported the district's decision not to deviate from what was working. Within the CSE, a group composed of qualified and experienced special education providers and administrators, there was no disagreement that the proposed IEP was appropriate and that N.G. was likely to derive educational benefits from it. Only his parents thought otherwise, yet they have failed to demonstrate that N.G. would have been

harmed, not helped, by the district's proposal.[35]

## 2. Least Restrictive Environment

The primary argument advanced by R.G. and J.G. in contesting the substantive validity of the IEP is that Kiryas Joel did not consider, much less offer, a mainstream placement to the maximum extent appropriate. Because the IEP was not reflective of what they believe N.G.'s least restrictive environment to be, R.G. and J.G. claim that he was denied his right to a free appropriate public education. The IHO, denying relief, remarked "that the nature and severity of [N.G.]'s disabilities is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." IHO Decision 122. The SRO agreed. SRO Decision 19–20.

■ In reaching this conclusion, the state authorities did not have the benefit of the Second Circuit's decision in *Newington* which provided a comprehensive framework for assessing a "least restrictive environment" challenge under the IDEA. 546 F.3d at 120–21; *see infra* at 639–40. Specifically, both the IHO and SRO assessed only whether N.G., to a satisfactory degree, could be educated in a regular classroom, provided he had supplementary aids and services to support him. While this properly is the first part of the inquiry, it is to be "elucidated and augmented" by "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Newington*, 546 F.3d at 120. Moreover, even if these factors weigh against a regular education placement for the child, the second part of the inquiry, which the IHO and SRO did not reach, requires a determination whether the child nonetheless has been mainstreamed to the maximum extent appropriate. *Id.*

■ Here, it is undisputed that Kiryas Joel did not take steps toward mainstreaming N.G. The district believed placement in a regular education classroom was inappropriate in light of his unquestionably extensive disabilities. As discussed, the district's recommendation that he be in its self-contained, special education classroom was neither predetermined nor unreasonable. At the IEP meeting, R.G. and J.G. stated their preference for mainstreaming, and the CSE explored the feasibility of that goal with them. But this conversation by itself does not constitute "reasonable efforts to accommodate N.G. in a regular classroom." *Id.* (quoting *Oberti*, 995 F.2d at 1217–18). To hold otherwise would be to minimize the burden on the district to "take[ ] creative steps to provide [N.G.] as much access to nonhandicapped students as it can," *Daniel R.R.*, 874 F.2d at 1050, in light of Congress's goal of maximizing the time that children with disabilities spend among their typically developing peers.

■ The most important step toward inclusion that a school district can take is "to provide supplementary aids and services to enable children with disabilities

---

**35.** N.G.'s parents expressed their fear that in a special education classroom N.G. might begin to imitate the bad habits or behavior of the other children with disabilities, but Gartenberg testified that children with disabilities are no more prone to learning inappropriate behaviors from one another than typically developing children in their respective classrooms because it is "part of [Kiryas Joel's] curriculum" and "responsibility to teach [its] children the social skills that they need for independence in the world." Tr. 5361–62.

to learn whenever possible in a regular classroom." *Oberti*, 995 F.2d at 1216. The *Oberti* court defined the "continuum of placements . . . to meet the needs of handicapped children," under 34 C.F.R. § 300.551(a), as resource rooms, itinerant instruction, "speech and language therapy, special education training for the regular teacher, behavior modification programs, or any other available aids or services appropriate to the child's particular disabilities." *Oberti*, 995 F.2d at 1216. An assistive technology also qualifies as a supplementary support. *A.G. ex rel. S.G. v. Wissahickon Sch. Dist.*, 374 Fed.Appx. 330, 334 (3d Cir.2010). Here, the record is scarce as to whether, in discussing N.G.'s parents' desire to place him at B'nai Yoel, the CSE considered the possibility of implementing supplemental aids and services to support a private placement. Kiryas Joel offers a range of therapies and operates a resource room at one of the local yeshivas, although not B'nai Yoel, but while this demonstrates that the district has the ability to provide a child with a mainstream experience, it cannot obscure the fact that N.G. himself was denied the opportunity to be educated alongside his typically developing peers. The district has within its self-contained, special education classroom a host of assistive technologies, yet the members of the CSE assumed without evaluating N.G. that his speech and language therapy skills were so basic that he could not possibly make use of any technology beyond what the district already had. If there is a continuum of educational placements, N.G. was placed squarely at the most restrictive end of it.

The Court is acutely aware of "the apparent tension within the [IDEA] between the strong preference for mainstreaming and the requirement that schools provide individualized programs tailored to the specific needs of each disabled child." *Oberti*, 995 F.2d at 1214. N.G.'s case is the exemplar of how a school district's decision to educate a child with disabilities in an exclusively special education environment can be reasonably calculated to provide educational benefits yet contrary to the IDEA'S preference for mainstreaming. *See id.* In fact, it is the belief of this Court that Kiryas Joel—with its highly trained and experienced teachers, its wealth of resources within the classroom, and its integrated therapy to make for a seamless educational experience—almost certainly could have bestowed on N.G. greater educational benefit than any other school within Kiryas Joel Village. *See* Tr. 5113–14. Yet, the IDEA requires that a public education be not only appropriate but also furnished to the child in his or her least restrictive environment. *See Oberti*, 995 F.2d at 1214 n. 18 (remarking that the statute "embodies an express tension between its two substantive commitments to the 'appropriate education' and to the 'least restrictive alternative'" (quoting Martha Minow, *Learning to Live with the Dilemma of Difference: Bilingual and Special Education*, 48 Law & Contemp. Probs. 157, 181 (1985))). A district can fulfill both of these substantive obligations by at least exploring the use of supplementary aids and services, as they are the tools to "enable the school to educate a child with disabilities for a majority of the time within a regular classroom, while at the same time addressing that child's unique educational needs." *Id.* at 1214. Given the lack of evidence as to whether the CSE considered supplementary supports that could have allowed N.G. to spend some of his school day at B'nai Yoel, and given the district's undisputed failure to undertake an assistive technology evaluation despite the fact that N.G. was almost entirely nonverbal, the Court cannot say with confidence that the district exhausted the possibilities for accommodating N.G. in a regular education classroom. *See Daniel R.R.*, 874 F.2d at 1048 ("The Act does not

permit states to make mere token gestures to accommodate handicapped students; its requirement for modifying and supplementing regular education is broad.").

Kiryas Joel's failure to take adequate steps to try to include N.G. in a regular education classroom also makes it difficult for this Court to conclude that the benefits to N.G. of a special education outweighed those of a regular education with supplementary aids and supports. The inquiry under the second *Oberti* factor is further complicated by the fact that a "regular education" within the unique community of Kiryas Joel means placement at a private yeshiva, where the subjects are prayer and Biblical recitation, not reading, writing, and arithmetic. What is clear, however, is that N.G. stood to derive a social, but not academic, benefit by attending B'nai Yoel, in terms of the opportunity to develop his language and communication skills through modeling his typically developing peers. *Oberti,* 995 F.2d at 1216–17. That N.G. would not have received the same academic advantages as his peers at B'nai Yoel—to the extent that a yeshiva education can be characterized as "academic" in the regular-education sense of the word—did not warrant his complete exclusion from that environment. *Id.* at 1217.

On the other hand, the CSE's recommendation of placement in the district's self-contained, special education classroom was, in the estimation of the IHO, the SRO, and now this Court, entirely reasonable in light of N.G.'s former placement in a similar segregated setting, during which time he exhibited progress. While any progress that N.G. went on to achieve at B'nai Yoel during the 2005–06 school year is relevant to whether that was an appropriate unilateral placement by his parents, the issue whether Kiryas Joel offered him his least restrictive environment depends solely on the information before the CSE at the time of the IEP meeting. At that time, N.G.'s educational background and disabilities fairly did suggest that continued placement in a special education classroom was appropriate. But R.G. and J.G. also informed the CSE of N.G.'s positive experience with B'nai Yoel's Sunday class, and yet the district did not respond by considering a regular classroom with supplementary aids and services. With this piece of the puzzle missing, the Court lacks the requisite expertise in educational policy to make a meaningful comparison between the educational benefits N.G. could have received from a regular education with satisfactory supports and those from a special education.

 While the presence of a regular education teacher at a CSE's meeting does not guarantee a child will receive a mainstream placement, it does help to ensure that this option receives fair consideration. Here, the Court maintains that the failure to include a regular education teacher was not a procedural violation of the IDEA, and, even if it were, it did not result in N.G. being denied a free appropriate public education. That being said, it nonetheless may have contributed to the fact that N.G. was not offered a regular education with supplementary aids and supports. At a certain point, the "nature and number" of procedural shortcomings in the development of an IEP begin to suggest that the child was not offered the substantive "educational opportunity that the procedural requirements of the IDEA were intended to protect," even if each inadequacy in the procedure, when taken individually, would not lend itself to such a conclusion. *Evans v. Board of Educ.,* 930 F.Supp. 83, 98 (S.D.N.Y.1996); *see Burlington,* 471 U.S. at 368, 105 S.Ct. 1996 (noting that the IDEA'S "elaborate set of what it labeled 'procedural safeguards'" exists to guarantee the "proper resolution of substantive disagreements").

The final *Oberti* factor that this Court considers is whether N.G.'s inclusion in a regular education environment would have had a "possible negative effect" on the education of the other children. 995 F.2d at 1217. This factor can be resolved with relative ease in N.G.'s favor. His educational and therapy evaluations from the 2004–05 school year, when he was at HASC, all describe him as a happy, adorable, smiling child who was generally cooperative. While he was prone to outbursts when asked to complete certain tasks, after a short crying spell, he was able to be successfully redirected. Moreover, his tendency to cry had "greatly improved," and there is no mention in his evaluations of this behavior negatively impacting other children. His evaluators described him as a highly distractible child with a constant need for redirection, but did not suggest that he was a disruptive force. At most, his evaluations support an inference that in a regular education classroom he would "demand so much of the teacher's attention that the teacher [would] be required to ignore other students." *Id.* But it is within the purview of even this Court's limited knowledge of special education that this problem likely could have been remedied with a one-to-one classroom aide—a possibility that Kiryas Joel apparently did not consider.[36] *See id.* ("An adequate individualized program with [supplementary] aids and services may prevent disruption that would otherwise occur.").

Yet, while the record does not indicate that N.G. was a disturbance in the classroom, the Court does not gloss over the profound and extensive nature of his disabilities. At age five, N.G. had not developed speech or language skills, rendering him unable to communicate with and engage in the world around him, and in all other areas of development he was signifi-

cantly delayed and functioning within the first-to-second percentile for his age group. It is for this reason that the Court is hesitant to conclude that education in the regular classroom, with the use of supplemental aids and services, could have been achieved satisfactorily for N.G. during the 2005–06 school year. Having undertaken an "individualized, fact-specific inquiry" into the IDEA'S mainstreaming requirement, *Daniel R.R.*, 874 F.2d at 1048, this Court ultimately finds itself returning to severity of N.G.'s disabilities as the limiting factor. *See Newington*, 546 F.3d at 119 ("Under the [IDEA], where the nature and severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate." (quoting *Briggs*, 882 F.2d at 692)). Application of the *Oberti* factors suggests that Kiryas Joel's consideration of mainstreaming N.G. was but a "mere token gesture[ ]" in response to his parents' request, *Daniel R.R.*, 874 F.2d at 1048, yet it is far from certain that a more substantial evaluation would have, or should have, resulted in N.G. being placed in a regular education classroom with supplementary supports.

Because this Court does not find by a preponderance of the evidence that N.G. could have been educated in a regular classroom with supplementary aids and services, the Court turns now to the second part of the mainstreaming test, that is, whether N.G. was included in school programs with nondisabled children whenever possible. Here, the conclusion is straightforward because Kiryas Joel's IEP recommended no mainstream component whatsoever. Even if this Court were to assume that N.G.'s specific educational needs demanded exclusion from the academic portion of the B'nai Yoel school day, this

***

**36.** The Court recognizes that this may be a reflection of Kiryas Joel's past difficulties with sending special education providers into B'nai Yoel. Tr. 829.

ought not have precluded socialization with typically developing peers during the yeshiva's non-academic offerings like lunch and recess. *See Wissahickon*, 374 Fed.Appx. at 334–35 (holding that a student was mainstreamed to the maximum extent possible where her IEP allowed for participation in lunch and recess, among other non-academic offerings like homeroom, alongside non-special education peers); *T.S. v. Weast*, Civ. No. 09–1581, 2010 WL 2431021, at *11 (D.Md. Jun. 10, 2010); *Laddie C. ex rel. Joshua C. v. Department of Educ.*, CV. No. 08–00309, 2009 WL 855966, at *5 (D.Hawai'i Mar. 27, 2009) (same); *M.T. ex rel. D.T. v. Board of Educ.*, No. 98 C 2914, 2000 WL 1222121, at *9 (N.D.Ill. Aug. 22, 2000) (same); *Swift ex rel. Swift v. Rapides Parish Pub. Sch. Sys.*, 812 F.Supp. 666, 673 n. 6 (W.D.La. 1993) (same).

Although this Court is sensitive to the logistical challenge that Kiryas Joel might face in transporting N.G. to and from B'nai Yoel for short periods of time each day, the record suggests that the district does precisely this for roughly half of its student body. *See T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579–80 (3d Cir.2000) (holding that "a district that does not operate a regular [education] program is not required to initiate one simply in order to create [a least restrictive environment] opportunity for a disabled child," but ought inquire into the availability of regular classroom options "within a reasonable distance"). Why Kiryas Joel failed to offer this same option to N.G. is not evident from the record. But by not providing for any social inclusion with children without disabilities in N.G.'s IEP, where there is no indication that it would have been inappropriate to do so, the district has not met its obligation under the IDEA to mainstream N.G. to the maximum extent appropriate.

This Court dutifully and searchingly has applied the two-part mainstreaming test that was adopted by the Second Circuit in *Newington* after the administrative proceedings in this case were concluded. Thus, while mindful that today's conclusion differs from that of the state review officers, the Court holds that Kiryas Joel failed to offer N.G. an educational placement in his least restrictive environment. *See Newington*, 546 F.3d at 120–21 (holding that judicial review of mainstreaming "must be searching, ... recogniz[ing] that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives."); *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir. 1988) ("[W]e do not read the Supreme Court's salutary warnings against interference with educational methodology. as an invitation to abdicate our obligation to enforce the statutory provisions."); *cf. Oberti*, 995 F.2d at 1222 (suggesting that, where the state education officials failed to give an issue adequate consideration, deference was not due). Because the district's failure to mainstream N.G. to the maximum extent appropriate amounts to a violation of the IDEA, this Court now must address an issue that the state officials did not reach: whether placement at B'nai Yoel was appropriate to meet N.G.'s special needs.

### F. Appropriateness of the Unilateral Private Placement

While this Court acknowledges that the appropriateness of Kiryas Joel's proposed IEP with respect to N.G.'s least restrictive environment was a close call, the question whether his unilateral private placement was appropriate "is easily disposed of under part two of the *Burlington* test." *Gagliardo*, 489 F.3d at 112.

■ In *Gagliardo,* the Second Circuit urged district courts to proceed cautiously when "called upon to review a case in which parents have enrolled their disabled child in a private school, believing it to be the best thing for the child, and can point to their child's record of success at the school they chose." *Id.* at 115. While progress is relevant, "it does not itself demonstrate that a private placement was appropriate." *Id.* (citing *Berger v. Medina City Sch. Dist.,* 348 F.3d 513, 522 (6th Cir.2003); *Rafferty v. Cranston Pub. Sch. Comm.,* 315 F.3d 21, 26–27 (1st Cir.2002)). The appropriateness of the unilateral private placement hinges on the extent to which "it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child.'" *Id.* (quoting *Frank G.,* 459 F.3d at 365) (emphasis in original).

■ Under this standard, it is inconceivable to this Court that enrollment at B'nai Yoel could have been an appropriate placement for N.G., despite his progress there. Most fundamentally, B'nai Yoel has no experience with or capacity to educate students with disabilities. Few of its teachers, if any, have attained an education beyond the yeshiva, or the equivalent of a high-school degree. None of N.G.'s various classroom aides had significant training in or experience with educating children with disabilities. Moreover, the aides' individualized sessions with N.G. were not designed to augment or complement his various therapies; rather, they appeared to be an extension of B'nai Yoel's religious education, although there was no formal coordination of lesson plans with the yeshiva.

B'nai Yoel's educational offering is tailored to provide an intensely religious education to typically developing students. As such, its school day consists of mostly prayer, Bible study, and storytelling. These are largely call-and-response activities/ in which N.G. as a child devoid of any real language abilities could not participate. Given his need for a high level of structure, supervision, and hands-on instruction and assistance to learn, N.G. appeared to derive little educational benefit from the yeshiva's lengthy prayer sessions. While B'nai Yoel offered N.G. an opportunity to interact with typically developing children, the record suggests that he spent much of his time unengaged with his peers, as one of his aides was observed to have abandoned him to play with the other children. Furthermore, while N.G. was beginning to imitate and mimic the behavior of the other children, it was not clear whether, in doing so, he was attempting to communicate or merely parroting back what he saw without understanding its meaning. Even R.G. and J.G.'s own retained expert, Kahn, testified that N.G. would not develop expressive communication simply by being exposed to other children.

■ A private placement need not furnish every special service necessary to maximize a child's potential, but in considering the totality of the circumstances, there must be some design in place for meeting the unique needs of the child. *See Frank G.,* 459 F.3d at 364–65. Here there was none. From an objective standpoint, N.G.'s home-based intervention program, developed by his parents and rife with its own inadequacies, could not substitute for a school placement "reasonably calculated to enable the child to receive educational benefits." *Id.* at 364. The IEP developed by Kiryas Joel may have been overly restrictive in placing him in the district's self-contained, special education classroom, but the alternative selected by his parents was inappropriate for the opposite reason: it failed to acknowledge that N.G., as a child with severe disabilities, needed significant accommoda-

tions and services if he were to make meaningful educational progress in *any* school environment. Therefore, this Court holds that the parents are not entitled to relief for their expenses related to N.G.'s placement at B'nai Yoel.

■ Ultimately, decisions about N.G.'s education rest in the hands of his parents—as they properly should. Not only does the IDEA give parents extensive rights to participate in the creation of their child's IEP, but also the fundamental constitutional right of parents to dictate the upbringing of their children as they see fit is well-established. *See Pierce v. Society of the Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (holding that a state law compelling public school attendance "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"); *see also Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (referring to parents' liberty interest in the care, custody and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by th[e Supreme] Court"); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (defining the right to "bring up children" as a part of one's liberty interest). This includes a "protected right to send their children to private schools if they so desire." *Gary S. v. Manchester Sch. Dist.,* 374 F.3d 15, 19 (1st Cir.2004) (citing *Pierce,* 268 U.S. at 534–35, 45 S.Ct. 571).

■ But this right is hardly absolute. In choosing a private school placement for their children, parents cannot expect that public funding will subsidize their choice. *See Norwood v. Harrison,* 413 U.S. 455, 462, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973) (noting that private or parochial schools have no right to share in state largesse); *but cf. Zelman v. Simmons–Harris,* 536

U.S. 639, 662–63, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002) (upholding the constitutionality of a publicly-funded voucher program where the tuition aid was used to attend religious schools). That the government may not infringe on that private choice unless the infringement is "narrowly tailored to serve a compelling interest," *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), does not mean that the government must foster that choice. *See Weidow v. Scranton Sch. Dist.,* No. 3:08–CV–1978, 2009 WL 2588856, at *11 (M.D.Pa. Aug. 12, 2009).

Here, the parents' private choice was also a religious choice. At first glance, this constitutional coupling of the fundamental right to bring up one's children with the Free Exercise clause of the First Amendment evokes *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), in which the United States Supreme Court invalidated Wisconsin's mandatory school-attendance law as applied to Amish parents who refused on religious grounds to send their children to school beyond the eighth grade. But, in *Yoder,* the law at issue, by imposing criminal penalties on parents for their noncompliance, directly burdened the free exercise rights of the Amish. 406 U.S. at 218, 92 S.Ct. 1526. In this case, there is no cognizable burden on N.G.'s parents' religious beliefs, as no state action is compelling them to give up the benefits associated with public school in exchange for the free exercise of their religion.

The Court does not question how central a religious education is to the collective identity of the Satmar Hasidic Jews who reside in Kiryas Joel Village. *See Grumet,* 512 U.S. at 691, 114 S.Ct. 2481, Nevertheless, in opting unilaterally to place N.G. at B'nai Yoel, though he was otherwise entitled to receive a free appropriate public

education, R.G. and J.G. must accept that public monies will not fund it. *But see* Lauri M. Traub, *The Individuals with Disabilities Education Act: A Free Appropriate Public Education—At What Cost?*, 22 Hamline L. Rev. 663, 686 (1999) ("The fact that parents choose to exercise their firmly held religious beliefs by placing their children in private schools should not relieve the districts of the obligation to provide services [under the IDEA]."). N.G.'s parents retain "ultimate recourse to the public school[ ] whenever the balance of services associated with attendance at [the yeshiva] appears to them to be unsatisfactory; but the option thus available can necessitate their having to choose, as here, between alternatives each of which may seem imperfect." *Gary S.*, 374 F.3d at 21. Furthermore, any suggestion to the contrary by this Court might run afoul of the other constitutional religion clause. *See Locke v. Davey*, 540 U.S. 712, 713, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) ("The State's interest in not funding the pursuit of devotional degrees is substantial and the exclusion of such funding places a relatively minor burden on [those involved in the funding program]. If any room exists between the two Religion Clauses, it must be here.").

N.G.'s parents do not, in fact, raise these constitutional claims to justify their placement of N.G. at B'nai Yoel, perhaps because they recognize the lack of judicial support for them. *See* Mark C. Weber, *Services for Private School Students Under the Individuals with Disabilities Education Improvement Act: Issues of Statutory Entitlement, Religious Liberty and Procedural Regularity*, 36 J.L. & Educ. 163, 210 (2007) ("Constitutional claims to an individual entitlement to special education services equivalent to what public school children receive lack support, be they claims of religious free exercise rights or rights to control the upbringing of one's children."). This Court, neither blind nor insensitive to the constitutional underpinnings, mentions them only because of the way in which they color the backdrop to this factually unusual case. In the end, however, this is but another statutory action under the IDEA, in which a child's parents challenge the adequacy of an educational plan offered by a public school district.

Yet, by no means does its ordinariness in this legal, if not factual, regard make it an easy case. Rather, like so many IDEA cases, it underscores the tension at the heart of the statute between the goal of mainstreaming a child with disabilities while simultaneously providing an individualized education plan for his or her unique needs.

> It reveals the conflict between the parent's expectations and the school district's educational objectives resulting from their differing perceptions of the student's abilities and needs. It shows how, despite the best efforts of the parent and the district, inevitable conflict results, Both want the best education for the student, but disagree on how to achieve it. Now, the parties [have] asked a court to resolve their differences.

*Greenwood v. Wissahickon School Dist.*, 571 F.Supp.2d 654, 658 (E.D.Pa.2008). This Court has delivered what it believes to be the best justice in this case, but recognizes that what is the best education for N.G. remains elusive.

## III. CONCLUSION

For the reasons stated above, the Court DENIES N.G.'s parents' claim for declaratory relief and reimbursement for privately obtained related services, a classroom aide, a home-based intervention program, and extended day services. The Court DENIES the claim for reimbursement for the gap in N.G.'s pendency entitlements.

Finally, the Court ORDERS that Kiryas Joel conduct an assistive technology evaluation of N.G., if one has not been undertaken since the due process demand notice originally was filed.

The Kiryas Joel Union Free School District's cross-motion for summary judgment [ECF No. 14] is ALLOWED, and judgment shall enter for the district.

**SO ORDERED.**